Cooke, J.
Shortly after one thirty on the morning of July 26, 1974 complainant drove her car to a point in front of her Buffalo apartment where she fell asleep behind the wheel. She testified as to having previously consumed five or six drinks. An hour or so later she was awakened by defendant Greer who inquired if she was all right or needed help. When defendant stated he was going to South Park and was walking, complainant offered a ride. At first he drove and, when he pulled in a driveway and got out of the vehicle, she moved to the driver’s side. Upon his re-entry into the car, she followed his directions and after a while realized they were just going in circles and not going any place. He asked her to stop the car. She was scared. It was in a nonresidential area near a warehouse. He put the car in parking gear and started to get out and, when she placed it in drive, he got back in, put it in park and took the keys. He started out again and, when she tried to lock the door, he grabbed it and got back in the car. When she beeped the horn, he grabbed her arm, twisted it and dragged her from the car. When she screamed, he told her not to make him mad. He had his hand on her mouth, put it on her throat and repeated his admonition not to make him mad. She was dragged 40 to 50 feet to a truck-docking area where she was pushed to the ground. She talked to him and, when she asked him about God, he said he was Mosely whom she knew was connected with rape and murder. Defendant then pulled off her shorts and had intercourse with her.
The complainant testified that during the ordeal she was afraid for her life and that all she thought about was dying. Seeing lights, she called for help and a police officer came to the scene. Buffalo Police Lieutenant Vaccaro testified: that while on a routine patrol he saw an automobile in the middle of Indiana Street in an industrial and vacant lot area; that the door on the passenger side was open with a woman’s sandal in the street near the open door, another in the car and a woman’s purse 30 or 40 feet down the street; that he heard a woman calling for help and, in turning his flashlight, saw a man on the ground against a loading platform with his trousers down around his ankles; that as defendant arose, *173 complainant was seen beneath him with no clothing from the waist down; that when Vaccaro with gun in hand asked, "What’s going on here?”, defendant replied, "this is my woman”; that the officer asked her name and Greer said, "I don’t know”; and it was observed that the woman was crying, her face was mud or tear-streaked and she was covered with dirt.
Defendant presented a different testimonial version. He took the stand and related: that he was 21 years of age, five feet 10 V2 inches tall and weighed 238 pounds; that about 3 o’clock in the morning of the day in question he noticed a woman whom he knew as Annie in an automobile on Elmwood Avenue; that complainant said she was waiting for someone and asked defendant to get in the car; that after talking a bit he asked her to drive him home to which she agreed; that at first he drove and then, after stopping to allow him to go to a friend’s house on Ferry Street, she drove, proceeding in time on Main Street past two police stations; that eventually they went up Indiana Street where she stopped the car; that she talked about her boyfriend with whom she had had an argument; that he left the car to void and upon returning found complainant standing outside the vehicle; that they talked and kissed and walked over to a truck-loading area where he put his jacket on the ground; that they were having intercourse on the jacket when the police arrived; that he told the police he knew the girl, that her name was Annie and that he did not know her name was Jeanne until charges were preferred; that he seen her on three prior occasions, on two of which he had had relations with her; and that he never told her his name was Mosely.
Based on this proof, a jury found defendant guilty of rape in the first degree, for which crime he had been indicted. The Appellate Division in turn unanimously reversed the conviction and granted a new trial because of errors it found. That court was in disagreement, however, as to whether coercion in the second degree should have been charged as a lesser included crime, the majority being of the opinion that the trial court’s refusal to so charge constituted reversible error.
By statute, "[i]n submitting a count of an indictment to the jury, the court in its discretion may, in addition to submitting the greatest offense which it is required to submit, submit in the alternative any lesser included offense if there is a reasonable view of the evidence which would support a finding that *174 the defendant committed such lesser offense but did not commit the greater” (CPL 300.50, subd 1). A "lesser included offense” is defined in this fashion: "When it is impossible to commit a particular crime without concomitantly committing, by the same conduct, another offense of lesser grade or degree, the latter is, with respect to the former, a 'lesser included offense’ ” (CPL 1.20, subd 37). Thus, before a jury is charged concerning a lesser included offense, two criteria must exist: (1) the offense being scrutinized for possible submission must meet the said statutory definition of a "lesser included offense,” and (2) there must be a reasonable view of the evidence which would support a finding that defendant committed the lesser offense but not the greater (People v Johnson, 39 NY2d 364, 367).
For our discussion, "[a] male is guilty of rape in the first degree when he engages in sexual intercourse with a female: 1. By forcible compulsion” (Penal Law, § 130.35, subd 1). Rape in the first degree is a class B felony. "Forcible compulsion” means "physical force that overcomes earnest resistance; or a threat, express or implied, that places a person in fear o/[ 1] immediate death or [2] serious physical injury to himself or another person, or in fear that he or another person will immediately be kidnapped” (Penal Law, § 130.00, subd 8; emphasis added). On the other hand, so far as pertinent, a person is guilty of the class A misdemeanor of coercion in the second degree "when he compels or induces a person to engage in conduct which the latter has a legal right to abstain from engaging in * * * by means of instilling in him a fear that, if the demand is not complied with, the actor or another will: 1. Cause physical injury to a person” (Penal Law, § 135.60, subd 1; emphasis added).
Here, the prosecution presented evidence of forcible compulsion under two theories. The first was under the category of physical force by proof of acts such as taking the car keys, twisting her arm, putting his hand on her mouth and throat, dragging her 40 or 50 feet, pushing her to the ground and pulling off her shorts. The second was that the victim’s resistance was overcome by a threat or threats which placed her in fear of immediate death. Under the first theory, where the forcible compulsion consists of physical force which overcomes earnest resistance, it is not essential that the victim be placed in fear of any sort of harm in order that the charge of rape in the first degree be sustained. In such instance, coercion would *175 not be a lesser included offense of rape in the first degree, so structured on a basis of physical force. It is not impossible to commit the crime of rape in the first degree, based upon physical force overcoming earnest resistance, without concomitantly committing, by the same conduct, the crime of coercion in the second degree (see CPL 1.20, subd 37).
As to the prosecution’s second theory of forcible rape, that the intercourse was compelled by a threat which placed the victim in fear of death, the only proof introduced regarding the victim’s state of mind, other than defendant’s version of consent, was that defendant stated to her that he was Mosely, a person she knew to be connected with rape and murder, as well as her testimony that she was afraid for her life and that all she thought about was dying. Upon this proof it was not a question of "serious physical injury” as opposed to "physical injury.” We need go no further here than to hold that there was no reasonable view of the evidence, in respect to the fear the victim was suffering, which would support a finding that defendant committed coercion in the second degree but not rape in the first degree.
Defendant contends that certain prejudicial errors were committed during his cross-examination. He was asked whether he and three others "jumped” a fellow named Dantonio and beat him up when he refused to give them money, to which he replied in the negative. At a conference between the trial court and counsel, attended by defendant, the Assistant District Attorney revealed a series of questions he intended to put to defendant when cross-examination resumed. Defense attorney’s request for a "full hearing” to determine whether the questions would be prejudicial was not granted. Upon returning to the stand, defendant again denied the Dantonio attempted robbery, posed in a somewhat different question. He denied possession at a certain address of a concealed and dangerous weapon. He admitted on March 18, 1969 that he stole an automobile but denied that on the same day he walked into an apartment, grabbed scissors, ripped a blouse off one girl and forced that .young lady and her companion into bed. Defendant urges that this cross-examination was designed to establish guilt by the implication of previous involvement in similar crimes and that the graphic nature of the questions and the suggestive manner of the prosecutor’s approach belie any claim that the inquiries were made in an effort to impeach defendant’s credibility.
*176 Scarcely necessary for repetition is the rule that a defendant who chooses to testify may be cross-examined concerning any immoral, vicious or criminal acts of his life which have a bearing on his credibility as a witness, provided the cross-examiner questions in good faith and upon a reasonable basis in fact, the law being inflexibly set against questioning as to such acts when the obvious intent is to show from character or experience a propensity to commit the crime for which defendant is on trial (People v Duffy, 36 NY2d 258, 262, cert den 423 US 861). The instant inquiries went to the witness’ disposition or willingness to place self-interest ahead of principle and society, as well as to his honesty and integrity (see People v Sandoval, 34 NY2d 371, 377). The good faith and reasonable basis of the prosecuting official were substantially demonstrated at the conference attended by the court, counsel and defendant whereat said official asserted that the Dantonio encounter and the weapon possession were the subject of Family Court determinations and that the automobile theft resulted in a youthful offender adjudication. Although it would be impermissible to use a youthful offender or juvenile delinquency adjudication to impeach the illegal or immoral acts underlying such adjudications may be employed for such a purpose (People v Duffy, 36 NY2d 258, 264, supra; Fisch, New York Evidence, § 460, p 266; cf. People v Rahming, 26 NY2d 411, 419). Defendant could have made an application for a Sandoval ruling, in advance of trial, to assist in deciding whether to take the stand, but chose not to do so (People v Sandoval, 34 NY2d 371, 375, supra). The trial court did not abuse the discretion vested in it, in determining the extent of the cross-examination bearing on defendant’s credibility, and the exercise of that discretion should not be disturbed (People v Schwartzman, 24 NY2d 241, 245, cert den 396 US 846).
The most difficult problem concerns the reception into evidence, over objection, of the testimony of the police officer that, after defendant said, "this is my woman,” the officer asked him her name and defendant replied that he did not know it. The District Attorney had served a notice specifying his intention to offer proof that "Defendant claimed that complainant was 'his woman’ ” but the notice did not indicate an intention to submit testimony that defendant could not or did not tell her name. Defendant urges that this admission as to inability to name the complainant was inadmissible as being involuntary, made without being informed of his Mi *177 randa rights, and as having been received without a hearing as to voluntariness, a demand for which was made during trial.
"[A] police officer may stop a person in a public place located within the geographical area of such officer’s employment when he reasonably suspects that such person is committing, has committed or is about to commit either (a) a felony or (b) a class A misdemeanor defined in the penal law, and may demand of him his name, address and an explanation of his conduct” (CPL 140.50, subd 1). Under the proof, Lieutenant Vaccaro was on a routine patrol at about four in the morning, while it was dark, and came upon a vehicle with its door open in the middle of a street in an industrial and empty lot area. A woman’s sandal and purse were strewn nearby on the street. He heard a call for help. The officer approached the defendant. With gun and flashlight drawn the officer asked, "what’s going on here” and received the reply, "this is my woman.” This led to the question as to her name, to which defendant responded, "I don’t know.” This was normal police investigative procedure, it was cursory and, most important, within the statutorily permissible demand for "an explanation of conduct.” Both questions were asked as part of Vaccaro’s initial, on-the-scene investigation. There was the possibility, as defendant claimed on trial, that the circumstances were compatible with innocence as well as guilt. The suspicious circumstances might well have been explained to the officer’s satisfaction, resulting in his withdrawal from the scene, but in any event were sufficient to require him to seek an explanation.
The situation here bears striking resemblance to that in People v Huffman (41 NY2d 29), where police officers on an early morning tour of duty observed several individuals standing on steps leading to the back door of a delicatessen. When the police vehicle approached, the group ran and defendant went behind some bushes. The officers left the car and one officer, with his revolver drawn but held at his side and pointed down, and the other, with his holster clasp-loosened and his hand on his bolstered weapon, ordered defendant, who was looking at one of the officers, to come out. When defendant emerged with empty hands in the air, the officers secured their weapons and defendant was asked, "What are you doing back here?”, to which defendant replied, "We were trying to break into that store.” It was held that such an admission, *178 although made before preinterrogation warnings, was admissible. Although the presence of drawn and reholstered weapons is indicative of a "police dominated” atmosphere which could affect defendant’s will to resist and although by drawing their weapons on defendant and thereby obtaining his acquiescence to their authority the officers gained custody and control of the defendant, it was concluded that the single question propounded to defendant did not constitute a process of interrogation to which Miranda is applicable (p 34). The conduct of defendant was viewed as highly suspicious and the question was held to be designed to clarify the nature of the situation confronted, rather than to coerce a statement (p 34).
Here, too, the circumstances with which Officer Vaccaro was confronted were bound to arouse suspicion. In asking his two questions, he was merely following good police practice by seeking an explanation of the situation. The fact that two simple questions were asked instead of the one in Huffman is legally insignificant, since the answer given to the first was not responsive and meaningful clarification or further explanation was required. It would be ludicrous to hold that a police officer in such a predicament was limited to but one question in his demand for an explanation, and section 140.50 does not so circumscribe.
A vital distinction exists between Huffman and this case, however, since there a suppression hearing as to defendant’s oral and written admissions was conducted. Obviously, defendant had been notified of the admissions. CPL 710.30 (subd 1) provides in part: "Whenever the people intend to offer at a trial (a) evidence of a statement made by a defendant to a public servant, which statement if involuntarily made would render the evidence thereof suppressible upon motion pursuant to subdivision three of section 710.20 * * * they must serve upon the defendant a notice of such intention, specifying the evidence intended to be offered.” The obvious purpose of the statute is to afford a defendant adequate time in preparing his case in respect to the voluntariness of a confession or admission (People v Ross, 21 NY2d 258, 262). Thus, as the Appellate Division observed, the notice of intention to offer evidence need not be served upon the defendant where there is no question of voluntariness (see CPL 710.20, subd 3). Since the notice of intention served by the prosecution did not include any reference to an admission by defendant that he did not know the victim’s name, defendant’s attorney objected *179 to the introduction of such testimony and asked that "a Huntley hearing * * * be given to my client at this time to determine the voluntariness of those statements.” In the colloquy between the trial court and counsel, no statements indicating good cause for the failure to include defendant’s admission in the notice of intention were advanced. The objection was overruled and the requested hearing in effect denied. Only upon a showing of good cause may the court permit service of the notice during trial with a reasonable opportunity to make a suppression motion during trial (CPL 710.30, subd 2) and, if good cause is not shown, a failure to give the required notice of intention before trial mandates exclusion of the statement or statements (People v Briggs, 38 NY2d 319, 323-324). In view of the deficiency of the notice and the denial of a suppression hearing, it was error, therefore, to have admitted evidence of the inculpatory statement by defendant that he did not know the name of the woman with whom he had just engaged in sexual intercourse. In the context of this case, in which defendant admitted the intercourse but claimed consent by the woman as well as prior intimacies with her, such testimony was crucial.
The order of the Appellate Division should be affirmed.
Judges Jasen, Gabrielli, Jones, Wachtler and Fuchsberg concur with Judge Cooke; Chief Judge Breitel concurs in result on the opinion by Mr. Justice G. Robert Wither at the Appellate Division.
Order affirmed.