THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ROBERT JOHNSON, Appellant.—Appeal by defendant from a judgment of the Supreme Court, Kings County, rendered September 15, 1977, convicting him of robbery in the first degree, robbery in the third degree and grand larceny in the second degree, upon a jury verdict, and imposing sentence. The appeal brings up for review (1) the denial, after a hearing, of defendant's motion to suppress certain statements made by him to the police and (2) the partial denial of defendant's motion to prohibit the prosecutor from inquiring into his previous convictions, pursuant to which the prosecutor was granted permission to inquire into defendant's two previous convictions for criminal possession of stolen property in the second degree. Judgment reversed, on the law, motions granted, count one of the indictment is dismissed and a new trial is ordered as to the crimes of robbery in the third degree and grand larceny in the second degree, or any lesser included offenses thereof. Early on the morning of April 23, 1976, Robert Sams and Jerome Rhoades were sitting in Sams' gold and white 1974 Cadillac, license plate 953 BVH, in the garage of Sams' apartment building. Someone approached from behind the car and ordered Sams to get out and not turn around. While Sams originally testified at the trial that he saw the perpetrator holding a gun, he indicated upon cross-examination that he had not looked at the perpetrator's hand. Sams complied with the perpetrator's command and stepped out of the car. He then saw the car being driven away with Rhoades still in it. Sams had at no time looked at the perpetrator during the commission of the crime and, consequently, he was unable to make an identification. On the same morning, Detective Lasonio Abrams was performing a tour of duty with Lieutenant Kelly and Detective Scapetti. They were working in civilian clothes and operating out of an unmarked detective cruiser. At 1:30 A.M. they received a radio alarm for a 1974 gold Cadillac bearing license plate 953 BVH, which was wanted in connection with a robbery. The car was being operated by a Black male, approximately 23 years old, wearing a full length salt-and-pepper coat and armed with a hand

gun. At 2:45 A.M. Detective Abrams spotted the car stopped in front of Walterio's Bar and Grill on Flatbush Avenue. He observed a Black male seated behind the steering wheel, approximately 20-25 years of age and wearing a salt-and-pepper coat. When the Cadillac started up, Detective Abrams followed in his vehicle. Shortly thereafter, the Cadillac stopped for a red light, whereupon Detective Abrams pulled up behind it. He and his two fellow officers emerged from their vehicle and walked toward the Cadillac, their guns drawn. The traffic light changed before they reached the Cadillac and it began to move. Detective Abrams yelled, "Police officer, stop the car." Simultaneously, two or three patrol cars containing four to six officers, arrived at the scene, blocking the Cadillac from proceeding further. According to the testimony of Detective Abrams, he approached the car, of which defendant was the only occupant, identified himself as a police officer and asked defendant to produce his license and registration. Defendant removed a vehicle insurance card from the glove compartment and showed it to Abrams. The insurance card bore the name "Sams". He asked defendant if he was Sams and defendant replied that he was. He then asked defendant if he owned the car, and defendant replied that he did not, that he had gotten the keys from a friend "in the bar", presumably Walterio's. He then asked defendant what his friend's name was. Defendant replied that he could not remember, but described him as a Black male, about his own age, and wearing a salt-and-pepper coat. Defendant was unable to produce a license and registration or any other identification, and was thereupon placed under arrest and taken to the station, a distance of some 10 to 12 blocks from the scene of the stop. Upon arriving at the precinct, defendant was informed of his *Miranda* rights for the first time. He indicated that he understood his rights and that he was willing to answer Detective Abrams' questions without an attorney being present. Detective Abrams then asked defendant where he had gotten the car and defendant reiterated that he had borrowed the keys from a friend. Defendant then admitted, however, that he was not Sams, but rather Robert Johnson. About one-half hour after Detective Abrams and defendant had arrived at the station, Detective Abrams left, apparently to look for the friend whom defendant had described. He returned some 15 to 20 minutes later and informed defendant that he had seen no one at Walterio's fitting the description given him. Defendant was then rearrested and charged with the crime of possession of stolen property. Defendant was subsequently indicted for two counts of robbery in the first degree and one count of grand larceny in the second degree. Count one of the indictment alleged that defendant had forcibly stolen the Cadillac from Sams and in the course thereof had used and threatened the immediate use of a dangerous instrument (see Penal Law, § 160.15, subd 3). Count two of the indictment alleged that in the course of the robbery defendant had displayed what appeared to be a pistol, revolver or other firearm (see Penal Law, § 160.15, subd 4). Defendant subsequently moved to suppress any statements made by him at the scene of the stop, as well as at the precinct, on the ground that he had not been informed of his *Miranda* rights prior to his being questioned by Detective Abrams. The court denied the motion, finding that the on-the-scene questions asked by Detective Abrams were permissible to establish identification and ownership of the car and that *Miranda* warnings were not necessary. The court further ruled that defendant's statements made at the precinct were admissible because they had been made after he had been adequately advised of his rights. The court then entertained defendant's *Sandoval* motion and ruled that the prosecutor would be barred from inquiring into

defendant's previous convictions for assault, petit larceny, attempted grand larceny and possession of stolen property as a misdemeanor. However, the court indicated that it would permit the prosecutor to question defendant regarding his two previous convictions for criminal possession of stolen property in the second degree, both of which involved the theft of an automobile. Defense counsel subsequently informed the court that defendant would not testify on his own behalf because of that ruling. The case then proceeded to trial. Jerome Rhoades did not testify at the trial, as his whereabouts were apparently unknown both to the complainant, Sams, and to the District Attorney's office. The latter had conducted an investigation about one month before the trial, but had been unsuccessful in locating Rhoades. When asked at oral argument of this appeal when his office had ascertained that Rhoades would not be available at the trial, the District Attorney replied that such unavailability was known to his office prior to the *Huntley* hearing. The jury returned a verdict of guilty as to counts one and three of the indictment (robbery in the first degree and grand larceny in the second degree, respectively), not guilty as to count two (robbery in the first degree), but guilty of robbery in the third degree as a lesser included offense of count two. In our view, the trial court committed error in denying defendant's motion to suppress the statements made by him at the time he was stopped. The record shows without dispute that Abrams, Kelly and Scapetti all had drawn their guns prior to approaching the Cadillac being driven by defendant. The Court of Appeals has forcefully stated that: "once the officer does draw his gun, the individual interrogated is actually deprived of his freedom and, under *Miranda,* he may no longer be questioned without first being warned of his rights, and any statement elicited without such warnings may not be received in evidence, or otherwise used, at a subsequent trial" *(People v Shivers,* 21 NY2d 118, 122). We are aware that the Court of Appeals has recently found occasion to distinguish *Shivers* under certain circumstances. (See *People v Huffman,* 41 NY2d 29; *People v Greer,* 42 NY2d 170.) However, we view *Shivers* as controlling here. The critical standard in determining whether *Miranda* warnings were required prior to questioning is whether the police have engaged in "custodial interrogation". If they have, then the failure to give the defendant his *Miranda* warnings renders any statement made by him inadmissible. If, on the other hand, the police have merely engaged in "permissible street inquiry", then the failure to give *Miranda* warnings is of no consequence *(People v Huffman, supra,* pp 32-33). In order to find that *Miranda* warnings were required, both the element of "custody" and the element of "interrogation" must be found to have been present *(People v Huffman, supra,* p 33). In the instant case, there is no question that the element of custody was satisfied. Defendant was approached by three officers, with drawn guns, and the path of the automobile he was driving was blocked by two or three patrol cars. The deprivation of freedom was clear. As to the element of interrogation, "The fact that there may have been police questioning is not controlling. Custodial admissions are not suppressible unless produced by a process of interrogation designed to elicit statements from the defendant" (see *People v Huffman, supra,* p 33). A question designed to clarify the nature of the situation confronted is permissible *(People v Huffman, supra,* p 34). In *Huffman,* the Court of Appeals indicated that it found two circumstances significant in determining whether the police had conducted an "interrogation". The first is whether the police were engaged in an after-the-fact investigation rather than having inadvertently found themselves in the middle of a possible criminal transaction where immediate clarification

was necessary before drastic action was taken. In *Huffman,* the situation was clearly the latter. In *Shivers,* on the other hand, "a definite crime had been committed, the criminal events at the crime scene had been concluded and the interrogation took place at a distance from the situs of the crime" *(People v Huffman,* 41 NY2d 29, 34, *supra).* The second significant factor is the extent of the questioning. In *Huffman,* only one question was asked. In *Shivers,* the court had termed the questioning "extensive". Viewing the instant case in the light of these factors, it will appear that the significant circumstances of after-the-fact investigation is present. As in *Shivers,* a definite crime had been committed, the criminal events at the crime scene had been concluded and the interrogation took place at a distance from the situs of the crime. We have no quarrel with Detective Abrams' request for identification. Such action is permissible under the statute (see CPL 140.50, subd 1). However, in view of the fact that Abrams knew that the car defendant was driving had been stolen by a man fitting defendant's description, we find that the further questioning concerning defendant's ownership of the car transcended the boundary between an attempt to clarify the situation and an attempt to elicit a statement. While the questioning in the instant case cannot be considered "extensive" as was the questioning in *Shivers,* this should not be a controlling factor. The fact that defendant was stopped while driving the stolen car obviated the need for extensive questioning. We view *Huffman* as a narrow exception to the broadly stated rule of *Shivers* regarding gun-point questioning. Inasmuch as the circumstances of the questioning herein bear little relation to either the letter or the spirit of *Huffman,* we believe that defendant's on-the-scene statements should have been suppressed. Nor do we consider the trial court's error in admitting these on-the-scene statements "harmless" merely because defendant reiterated those statements at the precinct, after he had been given *Miranda* warnings. Once the police had unlawfully questioned defendant at the scene of the stop, the subsequent *Miranda* warnings could not serve to legitimize subsequent questioning, "unless there [was] such a definite, pronounced break in the interrogation that the defendant may be said to have returned, in effect, to the status of one who is not under the influence of questioning" (see *People v Chapple,* 38 NY2d 112, 115; see, also, *People v Glover,* 58 AD2d 814). In the instant case, the evidence showed that defendant was arrested within minutes after his on-the-scene statements and immediately transported to the precinct, a distance of some 10 to 12 blocks, which took no more than five minutes to cover. Almost immediately upon his arrival at the precinct, defendant was given his *Miranda* warnings, whereupon he reiterated that he had borrowed the car from a friend. We cannot say that this chain of events indicates the definite pronounced break required by *Chapple* in order to permit introduction of defendant's precinct statements. We note that it is of no moment that defendant's statements were intended to be exculpatory, for as the Court of Appeals noted in *People v Shivers* (21 NY2d 118, 122, *supra),* quoting from *Miranda v Arizona* (384 US 436, 477), " 'If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution' ". Even if the police had not engaged in impermissible questioning, defendant would be entitled to a new trial on the basis of the trial court's erroneous *Sandoval* ruling, whereby the prosecutor would have been permitted to question the defendant, had he elected to testify, as to both the existence of, and the facts underlying, two previous convictions for possession of stolen property in the second degree, both of which involved the theft of an automobile. The Court of Appeals clearly stated in *People v Sandoval* (34 NY2d 371, 377) that: "cross-examina-

tion with respect to crimes or conduct similar to that of which the defendant is presently charged may be highly prejudicial, in view of the risk, despite the most clear and forceful limiting instructions to the contrary, that the evidence will be taken as some proof of the commission of the crime charged rather than be reserved solely to the issue of credibility." Under the circumstances presented herein, we find no justification in requiring the defendant to run that risk. The crime of possession of stolen property is not one such as is inherently relevant to the question of a defendant's credibility (see *People v Sandoval, supra,* p 377); nor can we agree that this is a situation in which the court was faced with "the prior commission of a particular crime of calculated violence or of specified vicious or immoral acts [which] significantly revealed a willingness or disposition on the part of the particular defendant voluntarily to place the advancement of his individual self-interest ahead of principle or of the interests of society * * * or in derogation of the interests of others" *(People v Sandoval, supra,* p 377). The admission of evidence as to the prior convictions is particularly suspect in view of the fact that the court prohibited inquiry into convictions of other crimes of a similar, if less serious, nature. The only pertinent distinction between the crimes excluded and those as to which inquiry was permitted is the similarity of the facts underlying the latter to those of the instant case. We cannot view a ruling which makes such a distinction as a proper exercise of the court's discretion. The Court of Appeals also indicated that "an important consideration may be the effect on the validity of the fact-finding process if the defendant does not testify out of fear of the impact of the impeachment testimony for reasons other than its direct effect on his credibility—as where the defendant would be the only available source of material testimony in support of his defense" *(People v Sandoval, supra,* p 378). We note the particular relevance of that concern here. The People's case consisted of no more than the circumstance of defendant being stopped while in possession of the stolen automobile, coupled with defendant's own statements. The complainant did not see the perpetrator and could make no identification. Rhoades, who was in the car when it was taken, was unavailable at the trial. Defendant had no witnesses other than himself. Under these circumstances, it was of vital importance to the defendant that he take the stand to explain his presence in the car and the reason for the statements purportedly made to the police. The importance of such testimony far outweighs the value of the two stolen property convictions in impeaching defendant's credibility. Lastly, we note, as the People concede, that count one of the indictment, charging defendant with robbery in the first degree, in that he used or threatened the use of a dangerous instrument, must be dismissed. The evidence wholly failed to show that the gun, if any, which the perpetrator is alleged to have brandished, was either loaded or used. Under these circumstances, a conviction for robbery in the first degree based upon use or threatened use of a dangerous instrument cannot stand (cf. *People v Early,* 59 AD2d 912; *People v Green,* 56 AD2d 610; *People v Briggs,* 52 AD2d 1053). Accordingly, the new trial must be restricted to the counts supported by the evidence, to wit, robbery in the third degree and grand larceny in the second degree, or any lesser included crimes thereof. In view of the disposition of the appeal, we need not reach defendant's other contentions, and we do not so do. Titone, J. P., Rabin and Margett, JJ., concur; Gulotta, J., dissents and votes to modify the judgment by reversing the conviction of robbery in the first degree under the first count of the indictment, and the sentence imposed thereon, and dismissing the said count, and to otherwise

affirm the judgment, with the following memorandum, in which Cohalan, J., concurs: Unlike my brethren in the majority, I cannot agree that the defendant's statements should have been suppressed. At about 1:30 A.M. on the morning of April 23, 1976, the investigating officer, Detective Lasonio Abrams, was apprised via radio communication that a gold, 1974 Cadillac, bearing license plate number 953 BVH, had been reported stolen. The thief was described as a Black male, approximately 23 years of age and wearing a full length "salt and pepper" overcoat. The suspect was reported to be armed with a gun. Approximately one hour and 15 minutes later, Abrams spotted the vehicle parked outside a bar in his assigned sector, with a young Black male wearing a "salt and pepper" overcoat seated behind the wheel. The car started to drive off and then stopped for a red light. At this point, Detective Abrams and his fellow officers emerged with their guns drawn. The light changed, the car began to move, and the officers halted the vehicle and identified themselves as the police. As Abrams approached the car, he asked the defendant for his license and registration. He was handed instead a vehicle insurance card bearing the name "Sams". Abrams then asked the defendant if he was Sams, and the defendant responded in the affirmative. When asked if he owned the car, however, the defendant answered in the negative, stating that he had gotten the keys from a friend "in the bar". Abrams then asked the defendant for his friend's name and defendant responded that he could not remember, but that he was a Black male about his own age and was wearing a "salt and pepper" coat. Unable to produce a license, registration or other identification, the defendant was arrested and taken to the precinct house. There the defendant was first given his *Miranda* warnings and agreed to speak to the detective without an attorney being present. He reiterated his prior story, but admitted that his name was not "Sams". In my opinion, the brief on-the-scene inquiry conducted by Detective Abrams did not constitute "custodial interrogation" (which clearly must be preceded by the *Miranda* warnings), but rather a series of limited, preliminary questions designed to clarify the situation by establishing (1) the ownership of the vehicle (i.e., whether the vehicle was, in fact, stolen as had been reported) and (2) the identity of its operator. It was only after the defendant was thus properly asked to produce his license and registration, and he responded by exhibiting a vehicle insurance card bearing the name "Sams", that Detective Abrams inquired of the defendant whether his name was "Sams", and it was only after the defendant answered that question in the affirmative, that the detective went one step further and asked "Sams" whether he was the owner of the vehicle in question. The defendant then replied that he was not and stated that he had gotten the keys from a friend "in the bar". The only additional question which the detective asked was the name of defendant's friend, which question the defendant could not answer except by way of description. Concededly, the defendant was then in custody. However, as the Court of Appeals has only recently stated in *People v Huffman* (41 NY2d 29, 33): "The critical standard running throughout [our decisions applying *Miranda*] is whether the police have engaged in 'custodial interrogation'. Whether this standard is present generally presents a mixed question of law and fact. *(People v Paulin,* 25 NY2d 445, 449.)* However, both the elements of police 'custody' and police 'interrogation' must be present before law enforcement officials constitutionally are obligated to provide the procedural safeguards imposed upon them by *Miranda.* The fact that there may have been police questioning is not controlling. *Custodial admissions are not suppressible unless produced by a process of interrogation designed to elicit statements from the defendant"* (emphasis

supplied). I find it difficult if not impossible to view the limited inquiry conducted by Detective Abrams in this light, where its manifest purpose was simply to determine the ownership status of the subject vehicle (i.e., to determine whether the call was a hoax and the defendant was its true owner). I therefore conclude that there was no requirement to inform the defendant of his *Miranda* rights at that time (cf. *People v Shivers*, 21 NY2d 118). The mere fact that more than one question was asked should not prove determinative (see *People v Greer*, 42 NY2d 170, 178). Moreover, it is conceded by the majority that the interrogation conducted at the precinct house was preceded by the necessary warnings. Turning briefly to the *Sandoval* question, it is my belief that Criminal Term's refusal to suppress defendant's two convictions of criminal possession of stolen property in the second degree did not constitute an abuse of discretion (cf. *People v Caviness*, 38 NY2d 227, 232). While it is true that both convictions arose out of the theft of an automobile (and were therefore similar in nature to the crime charged), the "knowing possession" of stolen property "with [the] intent to benefit himself or a person other than an owner thereof or to impede the recovery by an owner thereof" (Penal Law, § 165.45), clearly demonstrates a deliberate determination on the part of the possessor to further his own self-interest at the expense of society. Such a conviction is therefore highly probative on the issue of credibility (see *People v Sandoval*, 34 NY2d 371; *People v Watson*, 57 AD2d 143 [wherein a defendant's prior conviction of attempted rape in the first degree was deemed admissible for purposes of cross-examination in a subsequent prosecution for rape in the first degree]). Defendant's remaining convictions, all misdemeanors, were properly excluded in the exercise of the court's discretion, and I do not believe that their exclusion renders the admission of defendant's two prior felony convictions for criminal possession of stolen property in the second degree any the less proper. Although I conclude that the alleged errors cited by the majority do not require a new trial, I nevertheless agree (as the People concede) that defendant's conviction, under count one of the indictment, of robbery in the first degree must be dismissed as not supported by the evidence. The record is barren of any evidence tending to show defendant's use or threatened immediate use of a dangerous instrument during the commission of this crime (see Penal Law, § 160.15, subd 3; *People v Early*, 59 AD2d 912; see, also, *People v Green*, 56 AD2d 610; *People v Briggs*, 52 AD2d 1053).