THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
WILLIAM BOOKER, JR., Appellant.

Fourth Department, February 28, 1979

## APPEARANCES OF COUNSEL

*Edward J. Nowak, Public Defender (Brian Shiffrin* of counsel), for appellant.

*Lawrence T. Kurlander, District Attorney (Kenneth Fisher* of counsel), for respondent.

## OPINION OF THE COURT

DILLON, J.

Defendant contends on appeal from a judgment of conviction of criminal possession of a weapon in the second degree that the discovery of the loaded gun on his person was the product of custodial interrogation as that term is defined in *Miranda v Arizona* (384 US 436). Concededly he was not given the *Miranda* warnings prior to the police discovery of the weapon and on that basis he asserts that the seizure of the weapon and his arrest for its possession were unlawful. He further contends, *inter alia,* that his subsequent oral and written statements should have been suppressed because they were the unattenuated result of the prior unlawful seizure and arrest.

The circumstances of the initial police confrontation with the defendant were not such as to require the police to announce the procedural safeguards imposed upon them by *Miranda.* We find that neither the seizure of the weapon nor the subsequent arrest of the defendant for its possession was proscribed under settled State or Federal constitutional principles. Additionally, since the defendant's oral and written inculpatory statements were made in the station house after

defendant's knowing and intelligent waiver of his *Miranda* rights, they were admissible at his trial.

In light of the essential interrelationship of the Fourth and Fifth Amendments (see *Boyd v United States,* 116 US 616, 633), analysis necessarily involves, at least to a limited degree, the implications of both. Custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way" *(Miranda v Arizona, supra,* p 444). To determine whether a person has suffered a significant deprivation of freedom, it is essential to examine the circumstances and the atmosphere under which he has been detained and interrogated *(People v Rodney P. [Anonymous],* 21 NY2d 1).

Officer Kilborn was alone on duty in a patrol car on May 11, 1976 when he was directed by radio dispatch to proceed to Weld and North Union Streets to investigate a report that there was "a man with a gun and shots being fired". He proceeded to the intersection and stopped his vehicle in front of a corner building at 153 North Union Street which housed an apartment over two stores. There was a stairway in the center front of the building which led to the apartment and upon exiting his vehicle, he observed three females come down the staircase and run from the building. Upon asking them of the whereabouts of the man with the gun, they pointed up the staircase and the women continued running.

Within 45 seconds Officer Kulp, who had also heard the radio dispatch, arrived at the scene and the two policemen, with guns drawn, went up the staircase. The door to the apartment was open and there was a hallway immediately inside. Kilborn proceeded to the right along the hallway while Kulp moved to the left. Kilborn observed the kitchen and a bedroom at the end of the hallway. About five feet down the hall he came upon the entrance to a living room on his left and there he observed the defendant seated on a couch.* Subsequent events were described by Kilborn as follows:

"Q. Did you say anything to Mr. Booker at this time?

"A. Yes, sir, I asked Mr. Booker about the incident. I told him I received a radio call of a man with a gun and if he had any knowledge concerning it.

"Q. Did he say anything to you?

---

* The defendant did not reside in the apartment.

"A. At this instance he stated, no, he didn't know anything about it. He was sleeping and he didn't know what was going on.

"Q. What did you do then?

"A. Again I asked Mr. Booker or told Mr. Booker we had received a radio call with a man with a gun and shots being fired, and three females that just run down the staircase and pointed up the stairs that there was a man up here with a gun.

"Q. What did he say at that point?

"A. Mr. Booker stated to myself that he knew nothing about a shooting, but he knew where a gun was in the apartment.

"Q. What happened at that point?

"A. I asked Mr. Booker to please go where he thought the gun was and point it out to myself. At which time we went from the living room area into the bedroom and Mr. Booker stated the gun he knew about in the apartment was underneath the mattress in the bed. I lifted up the mattress to the bed and there was no gun underneath the mattress.

"Q. Now did Mr. Booker seem intoxicated in anyway?

"A. No, sir, he was not.

"Q. What did you say to him at that point?

"A. At this point I stated to him somebody apparently was lying. We received a radio call about a man with a gun, three females running down the staircase and I asked him where the man with the gun was and I stated to him that I asked three females where the man was and they pointed up here and he was the only man in the apartment. I said you don't have any knowledge concerning the gun? I asked him this question. He said, well, yes, at which time he opened up his jacket which he was wearing and the gun was stuck in his front belt area."

Kilborn removed the loaded gun from the defendant's belt area and asked the defendant if he had a permit. Upon his claim that he had a permit, Kilborn said that he would take the gun to police headquarters and give the defendant a receipt for it. The defendant then said that he had no permit for the gun and he was placed under arrest for unlawful possession of a dangerous weapon.

On these facts, the defendant's reliance on *People v Shivers* (21 NY2d 118) and *People v Cesare* (55 AD2d 959) is mis-

placed. Those cases condemned unreasonable investigatory police conduct other than at the scene of the crime and substantially after its completion. Our inquiry concerns police action taken at the crime scene in immediate response to a report of ongoing criminal activity. The import of the distinction is articulated in *People v Huffman* (41 NY2d 29, 34-35) where *Shivers* was found not to be controlling on the basis that there "a definite crime had been committed, the criminal events at the crime scene had been concluded and the interrogation took place at a distance from the situs of the crime" *(People v Huffman, supra,* p 34; see, also, *Conyers v State,* 24 Crim L Rep 2257 [Del, Nov. 30, 1978]).

The reasoning of *Huffman* applies with equal force here. Officers Kilborn and Kulp were acting in response to an urgent police radio report of gunfire which required them, in the nighttime, to enter a high crime area where, according to the testimony, gunshots are often reported. Upon inquiry directed to three citizens regarding a man with a gun, they were directed to the upstairs apartment. Given the radio report and the citizen response, the appropriate police action upon entering this inherently dangerous atmosphere was to conduct an investigative inquiry, as Officer Kilborn did, to determine whether in fact a crime had been committed. Officers Kilborn and Kulp certainly had reasonable suspicion to believe that a crime may have been committed, "thus giving them the right—in fact a duty—to inquire whether the [defendant] had knowledge as to the present whereabouts of the [gun]" *(Matter of Kwok T.,* 43 NY2d 213, 219). Preinterrogation warnings were not an essential precondition to such inquiry *(ibid).* At the very least, as in *People v Stewart* (41 NY2d 65, 69), Officer Kilborn was justified in making "a verbal and visual inquiry while taking due precaution for his own safety". In the context of this case, due care surely required, for the protection of themselves and others, that police weapons be at the ready.

While it is settled beyond argument that the presence of a drawn revolver is indicative of a police dominated atmosphere, the issue here is not so much whether the defendant was in the custody and control of the police as it is whether the questions asked of the defendant constituted a process of interrogation to which *Miranda* is applicable. In our view, this defendant was no more compelled to respond against his will

than were the defendants in *People v Huffman* (41 NY2d 29, *supra)* or *People v Greer* (42 NY2d 170).

The first few questions asked by the police were designed, as in *Huffman,* "to clarify the nature of the situation confronted, rather than to coerce a statement" (p 34). Although disclaiming any knowledge of the events which prompted the police presence in the apartment, the defendant volunteered that there was a gun under the mattress. While at trial the defendant claimed that the gun was in fact found by the police under the mattress, the police version was to the contrary. Since the defendant's initial response to the police inquiry was untrue, "meaningful clarification or further explanation was required", as in *Greer (People v Greer, supra,* p 178).

In response to further but limited inquiry, the defendant opened his jacket to expose a gun stuck in his belt. The presence of the gun was revealed not by a frisk, as it justifiably might have been in these circumstances (see *Terry v Ohio,* 392 US 1; cf. *People v Williams,* 41 NY2d 65) but by the defendant's own act. Significantly, he was never asked whether he possessed a gun; he was only asked, in accordance with the limited information then available to the police, whether he had any knowledge of a man with a gun and gunshots having been fired. That kind of police inquiry is to be encouraged, not proscribed. There is no "constitutional requirement that the police recite interrogation warnings when they direct questions or comments at members of the public or solicit information and assistance. A contrary holding would be impracticable, destructive of stable police-community relationships, and was never intended, by any stretch of the imagination, by *Miranda" (People v Huffman, supra,* p 33). *Miranda* was not intended to hamper the traditional function of police officers in making inquiry at the crime scene *(Miranda v Arizona,* 384 US 436, 477, *supra).*

■ Additionally, we find no merit to defendant's claim that the court erred in denying his motion for a mistrial when cross-examination of a prosecution witness was interrupted and thereafter foreclosed because of the witness' illness. The court twice instructed the jury to disregard the entire testimony of the witness and there is nothing in the record to suggest that the jury was incapable of following the instructions, particularly in light of its acquittal of defendant on the charge of menacing.

Finally, there is no merit to defendant's *pro se* application by letter of November 20, 1977 in which he seeks a reduction of sentence.

Accordingly the judgment should be affirmed.

SIMONS, J. (dissenting). Under the *Miranda* ruling, the prosecution may not use statements stemming from custodial interrogation of a defendant unless it demonstrates that the procedural safeguards required by that decision, the familiar fourfold warnings, have first been administered to the defendant to secure his privilege against self incrimination *(Miranda v Arizona,* 384 US 436; and see *Orozco v Texas,* 394 US 324). Beyond question a defendant confronted by two police officers with drawn weapons is in custody *(People v Shivers,* 21 NY2d 118; *People v Cesare,* 55 AD2d 959), and thus the statements elicited from this defendant and the gun discovered as a result of repeated police questioning of him prior to any *Miranda* warnings should have been suppressed.

The People contend that the statements were admissible under recent rulings of the Court of Appeals (see *People v Huffman,* 41 NY2d 29; *People v Greer,* 42 NY2d 170). In the cited cases, defendant's statements were volunteered, extemporaneous, or the response to limited inquiry when the police inadvertently came upon the scene of a suspected night street crime. In this case the police were responding, after the fact, to an anonymous telephone call reporting a man with a gun in the vicinity of the intersection of North Union and Weld Streets. They proceeded to the scene, entered a private apartment with shotgun and revolver drawn and interrogated a man awakened from sleep. Inculpatory evidence was obtained from him only after repeated questioning and after a search of the bedroom had failed to produce the suspected gun. Undoubtedly the police had the duty to investigate the complaint and the right to protect themselves in doing so, but their custodial interrogation violated defendant's constitutional rights and the evidence should have been suppressed (see *People v Johnson,* 64 AD2d 907, 911).

Furthermore, the inquiry was not permissible under common-law rules or stop and frisk statutes because it occurred in a private apartment (cf. *Terry v Ohio,* 392 US 1; CPL 140.50), while the defendant was in custody (cf. *Matter of Kwok T.,* 43 NY2d 213) and went beyond a threshold-type inquiry (cf. *People v Huffman, supra,* pp 31-33).

Statements obtained from the defendant in the station house less than an hour later also should have been suppressed because they were the product of the prior illegal police activity *(People v Stewart,* 41 NY2d 65; and cf. *People v Martinez,* 37 NY2d 662).

The judgment should be reversed, the motion to suppress granted and the indictment dismissed.

MOULE, J. P., and HANCOCK, JR., J. concur with DILLON, J.; CARDAMONE and SIMONS, JJ., dissent and vote to reverse the judgment and dismiss the indictment in an opinion by SIMONS, J.

Judgment affirmed.