People v Adams (2024 NY Slip Op 51014(U))

[*1]

People v Adams

2024 NY Slip Op 51014(U)

Decided on August 6, 2024

Criminal Court Of The City Of New York, Kings County

Glick, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on August 6, 2024
Criminal Court of the City of New York, Kings County

The People of the State of New York

against
Emanuel Adams, Defendant.

Docket No. CR-036960-22KN

Prosecution: Kings County District Attorney's Office by ADA Rishai McDermott
Defendant: The Legal Aid Society by Kelechi Alfred-Igbokwe, Esq.

Joshua Glick, J.

Defendant is charged with V.T.L. §1192(2), Operating a Vehicle While Intoxicated and related charges in connection with an incident that allegedly occurred on December 21, 2022.
Defendant moves to suppress noticed statements, physical evidence, chemical test evidence, police observations, video recordings, photographs, and all other fruits of his arrest by police. Defendant also moves to preclude statements he argues were not properly noticed.
The Prosecution opposes.
On May 13, 2024, the Court conducted a combined Dunaway, Huntley, Ingle, and Johnson hearing. The Prosecution presented two witnesses at the hearing, Police Officers Christopher Scaperotta and Tahan Terrell. The Prosecution admitted into evidence the body-worn camera footage (BWC) of each officer, a photograph of the scene, and a photograph of the items in the center console of Defendant's vehicle. Defendant did not present any witnesses or admit any evidence. After testimony was concluded, both parties submitted written memoranda.
The Court now makes the following findings of fact and conclusions of law.
 FINDINGS OF FACT
The Court finds as fact all events depicted in the videos admitted into evidence. The Court also credits the testimony of Officers Scaperotta and Terrell to the extent set forth below and makes the following specific findings of fact.
Testimony of Officer Christopher Scaperotta
Officer Christopher Scaperotta has been employed by the New York City Police Department (NYPD) for approximately thirteen and a half years. For the past year and a half, he has been a field training officer assigned to the 69th Precinct. On the date of this alleged incident, he was working as a property officer. Over the course of his career, Officer Scaperotta has made or assisted in approximately five arrests for suspected driving while intoxicated. He has not received any specialized training in identifying intoxicated drivers.
On December 21, 2022, Officer Scaperotta was working with a partner, Officer Tahan Terrell, in uniform, in a marked police vehicle. Around 8:30 a.m., they responded to a radio run [*2]about an unconscious person inside a vehicle at the gas station at the corner of Rockaway Parkway and Seaview Avenue. At the scene, Officer Scaperotta observed a white van matching the description from the radio run parked in the driveway, obstructing traffic. Officer Scaperotta approached the driver's side and observed Defendant unconscious in the driver's seat. Officer Terrell walked up to the passenger side. Unsure if Defendant needed medical assistance, Officer Scaperotta attempted to wake Defendant by knocking and banging on the window. Defendant did not wake immediately. Officer Scaperotta walked around the back end of the van to the passenger side. As he did, he noticed that the taillights were on. He asked Officer Terrell if the keys were in the ignition, which Officer Terrell answered affirmatively by looking through the window. The engine was not running, but the battery was activated. Officer Scaperotta expressed concern that Defendant may wake up and abruptly drive into the busy intersection, where he was at risk of hitting another car or a pedestrian. Officer Scaperotta returned to the driver's side and continued trying to wake Defendant. As he did, he attempted to open the door, but it was locked.
After about two minutes, Defendant awoke and turned the engine on to roll the window down. Officer Scaperotta initiated a conversation with Defendant, asking what was going on and if he was okay. Officer Scaperotta stood approximately one foot away from the vehicle. Officer Scaperotta noticed an odor of alcohol from inside the vehicle. He also noticed that Defendant had watery eyes; once Defendant began speaking, Officer Scaperotta noticed his speech was slurred.
Officer Scaperotta started by asking, "What's going on today?"
Defendant responded, "I'm going about my day" and started to roll the window up.
Officer Scaperotta put his hand on the window and said, "No, no, no, we got a phone call saying you're unconscious in the car, and when I came up to you, you were sleeping in the car." Defendant offered a short, mumbled response.
Scaperotta continued, "I gotta make sure you're okay. Are you okay?" Defendant indicated he was okay.
Scaperotta then asked for Defendant's ID, which Defendant provided. While holding Defendant's ID, he asked if the vehicle was Defendant's and what Defendant was doing there. When Defendant said work had brought him there, Scaperotta asked follow-up questions about Defendant's occupation, like where he works.
About two minutes into the conversation, Defendant indicated Officer Scaperotta was asking too many questions, or something to that effect. Scaperotta responded by asking what he meant and saying they were there to help him. At this, Defendant said he did not want any help. Scaperotta said Defendant could not leave immediately anyway because he still had Defendant's ID. Defendant shifted the van into drive and it lurched forward. Immediately, Officer Scaperotta opened the door and ordered Defendant out.
When Defendant was standing outside the van, Officer Scaperotta asked Defendant if he had been drinking. Defendant replied that he had had "a little shot" and that it had been his birthday yesterday. He also pointed inside the open door of the vehicle, which alerted Officer Scaperotta to a bottle of tequila in the center console. Officer Scaperotta smelled alcohol on Defendant's breath as he spoke. While Defendant stood outside the vehicle, Officer Scaperotta returned to the open vehicle door and removed the keys from the ignition. He asked Defendant when he had had the shot, to which Defendant said it had been late the previous night. Officer Scaperotta asked if Defendant had any medical conditions; Defendant said he did not. During this interaction, Defendant was not handcuffed or physically restrained.
Several minutes later, Officer Scaperotta handcuffed Defendant and placed him under arrest. Based on Defendant's slurred speech, watery eyes, unsteadiness on his feet, and odor of alcohol on his breath, Officer Scaperotta concluded that Defendant was intoxicated.
Testimony of Officer Tahan Terrell
Officer Tahan Terrell has been employed by the NYPD for more than two and a half years. He is assigned to the 69th Precinct as a youth officer. Defendant's arrest is the only arrest for suspected driving while intoxicated in which Officer Terrell has participated. At the police academy, he received basic training in identifying intoxicated drivers.
On December 21, 2022, Officer Terrell was working with a partner, Officer Scaperotta, in uniform, in a marked police vehicle. The pair received a radio run about an unconscious man in a vehicle and went to the scene, the gas station at the intersection of Rockaway Parkway and Seaview Avenue. Upon arrival, Officer Terrell observed a white vehicle matching the description in the radio run parked in an active driveway. The officers approached the vehicle, with Officer Terrell on the passenger side. Through the window, he saw Defendant sitting unconscious in the driver's seat; in the center console, Officer Terrell saw a half full bottle of Patron tequila and two clear cups filled with liquid. Officer Terrell knocked on the window to wake Defendant, but Defendant did not rouse immediately.
After the officers conferred briefly about whether the keys were in the ignition, they resumed knocking on the windows. When Defendant woke up, Officer Terrell instructed him to roll the windows down. Defendant turned the keys in the ignition, starting the engine, then rolled the windows down. Officer Scaperotta spoke with Defendant while Officer Terrell waited on the passenger side. During Officer Scaperotta's conversation with Defendant, Defendant put the vehicle in drive, and it lurched forward. Immediately, Officer Scaperotta ordered Defendant out; Officer Terrell instructed Defendant to put the vehicle back in park, which he did before exiting.
When Defendant was standing outside the vehicle, Officer Terrell walked around the front of it to the driver's side. He stood two or three feet away from Defendant. As he listened to Defendant's conversation with Officer Scaperotta, Officer Terrell noticed Defendant's speech was slightly slurred; based on his slurred speech, the bottle of tequila in the center console, and his statement that he had been drinking, Officer Terrell believed Defendant was intoxicated.
Around 8:45 a.m., the officers placed Defendant under arrest. They transported him in their police vehicle to the 78th Precinct Intoxicated Driver Testing Unit (IDTU). Officer Terrell accompanied Defendant to the IDTU, where Officer Christopher Ryan offered Defendant a chemical test around 10:15 a.m. and administered refusal warnings. Defendant consented and took the breath test.

CONCLUSIONS OF LAW
At a suppression hearing, the prosecution has the burden of going forward to show, by credible evidence, the lawfulness of the police conduct (People v Hernandez, 40 AD3d 777 [2007]; see also People v Berrios, 28 NY2d 361 [1971]; People v Wise, 46 NY2d 321 [1978]). To evaluate the police conduct, the Court must determine whether it was justified at its inception and whether it was reasonably related in scope to the circumstances at the time (People v DeBour, 40 NY2d 210 [1976]). If the prosecution satisfies the initial burden of going forward, the defendant "bears the ultimate burden of proving that the evidence should not be used against him" (People v Berrios, 28 NY2d at 367).
[*3]Probable Cause (Dunaway)
The Court of Appeals has established a four-tiered method for evaluating the propriety of police-initiated street encounters (People v DeBour, 40 NY2d at 223). Level one allows the police to request information based on an objective, credible reason, not necessarily indicative of criminality (id.). Level one requests for information include only basic, nonthreatening questions, such as identity, address, or destination (People v Hollman, 79 NY2d 181, 185 [1992]). Level one also permits an officer to approach a parked vehicle (People v Eugenio, 185 AD3d 1050, 1051 [2020]). Level two is the common-law right of inquiry based on a founded suspicion that criminal activity is afoot (Debour at 223). Pointed questions that would lead the person approached to reasonably believe he or she is suspected of some wrongdoing require level two suspicion (People v Hollman, 79 NY2d at 185). Level three authorizes the police to forcibly stop and detain a person if the police have a reasonable suspicion that the person was involved in a crime (DeBour at 223). Finally, level four permits police to arrest a person based on probable cause that he or she has committed a crime (id.). 
Here, Officers Scaperotta and Terrell were responding to a 911 call about an unconscious person. When they arrived, they saw a vehicle matching the description from the call with an unconscious man in the driver's seat. Because the car was stopped when the police approached, this began as a DeBour level one encounter (People v Harrison, 57 NY2d 470, 475 [1982]; People v Larkin, 62 Misc 3d 62, 66 [2018]). The vehicle was not lawfully parked but was obstructing an active driveway; the precarious parking conditions and the impetus to perform a wellness check created an objective credible reason to approach. Thus, the police behaved lawfully when they approached Defendant's vehicle (People v Valerio, 274 AD2d 950 [2000] [holding that a vehicle being illegally parked provides an objective, credible reason for police to approach but does not elevate the circumstances to De Bour level two]; People v Carr, 103 AD3d 1194 [2013] [affirming the holding in People v Valerio]; see generally People v Brown, 2024 NY Slip Op. 02765 [2024] [noting that the community caretaking doctrine permits minor police intrusions as needed for them to assist drivers whose vehicles become disabled for reasons totally divorced from criminality]).
Once the officers succeeded in waking Defendant, Officer Scaperotta asked him some questions, like what was going on, where he was coming from, and if he was okay. He also asked Defendant for identification. Officer Scaperotta's questions were non-threatening and did not imply any suspicion of wronging. Thus, the police behaved lawfully (People v Hollman, 79 NY2d 181, 185 [1992] [holding that a police officer may ask questions about identity and reason for being there, and for a person to produce identification during a De Bour level one encounter]).
Defendant argues that what came next was an unlawful seizure because the officers did not have the requisite suspicion to prevent Defendant from leaving. Ordering a person from a parked vehicle constitutes a De Bour level three intrusion and must be founded on a reasonable suspicion that such person has committed, is committing, or is about to commit a crime (People v Larkin, 62 Misc 3d 62, 66 [2018]). By the time Defendant shifted gears into drive, presumably to leave the scene, Officer Scaperotta had observed enough to raise alarm bells about Defendant's ability to drive safely. From the outset, Defendant was parked in an active driveway obstructing traffic. While this alone did not escalate the circumstances under the De Bour framework, it contributed to the broader context. Officer Scaperotta smelled alcohol and noticed Defendant's slurred speech and watery eyes, all classic indicia of intoxication. Defendant also [*4]attempted to leave while Officer Scaperotta still held his license, implying substandard judgment. Taken together, the officers had reasonable suspicion that Defendant was about to drive under the influence of alcohol and by detaining him, they forestalled the commission of a crime. Officer Scaperotta behaved lawfully when he opened the door of the van and ordered Defendant out (see In re Bank of New York, 81 AD2d 805 [1981, Birns, J. and Sandler, J. concurring] [finding that police were justified in ordering the defendant out of the car where they observed him sleeping in his car with the battery activated but engine off and the defendant had slow movements, slurred speech, and insulted the officer]; People v Kehley, 166 Misc 2d 846 [1995] [holding that in the context of a vehicle stopped at a toll booth, the officer was justified in asking the driver to exit the vehicle after observing him to have bloodshot, watery eyes and seeing him approach erratically]). Finally, both officers were standing very close to the van as it lurched forward; their physical proximity presented a danger to them, especially if Defendant was impaired by alcohol, further necessitating the seizure.
To find probable cause to arrest, the police must have a reasonable belief that it is more probable than not a crime has been committed and the person arrested is the perpetrator (People v Carrasquillo, 54 NY2d 248, 254 [1981]). Once Defendant was outside the van, Officer Scaperotta asked if he had been drinking and he answered affirmatively. Police are permitted to ask pointed questions that would make a reasonable person believe he is suspected of wrongdoing so long as they have a founded suspicion that criminality is afoot, or De Bour level two suspicion (People v Hollman, 79 NY2d at 185). As discussed above, the police already had De Bour level three suspicion, so this question was proper. Defendant also pointed out the open bottle of Patron tequila in the center console. He told Officer Scaperotta how he had been out celebrating his birthday the night before. Officer Scaperotta noticed the odor of alcohol on Defendant's breath and his verbal slurring. Officer Scaperotta's observations combined with Defendant's admissions furnished the police with a reasonable belief that Defendant was intoxicated and that he had been operating the vehicle (People v Johnson, 140 AD3d 978 [2016]; People v Blajeski, 125 AD2d 582 [1986]).
Defendant argues that the police lack any evidence that Defendant was driving, undercutting probable cause to arrest. Defendant's argument fails on several fronts. First, each section of VTL §1192 under which Defendant is charged begins, "no person shall operate a motor vehicle " (emphasis added). Courts have recognized that the definition of "operation" of a vehicle goes beyond merely driving; "a person operates a motor vehicle within the meaning of the statute when, in the vehicle, he intentionally does any act or makes use of any mechanical or electrical agency which alone or in sequence will set in motion the motor power of the vehicle" (People v Prescott, 95 NY2d 655, 662 [2001] [internal citations omitted]. Even when the engine is not running, evidence that the keys are in the ignition and the defendant is behind the wheel may be sufficient to establish operation (People v Dunster, 146 AD3d 1029 [2017] [holding that operation was established where the defendant was found sleeping alone in the driver's seat of a lawfully parked vehicle with the keys in the ignition and the engine turned off]; People v Shaffer, 95 AD3d 1365 [2012] [finding sufficient circumstantial evidence of operation where the police observed the defendant wearing a helmet, sitting astride a motorcycle with the kickstand up, the keys in the ignition, but the engine turned off, and where the police never saw the defendant drive, but heard the defendant explain how he had come to be in that location by driving]).
Second, whether a person actually drove a vehicle is an issue best resolved at trial; circumstantial evidence of operation can be sufficient to establish probable cause to arrest under [*5]VTL §1192 (People v Williams, 161 Misc 2d 523 [1994]; People v Khan, 182 Misc 2d 83 [1997]). Here, the police had circumstantial evidence that Defendant had driven in an intoxicated state: he was the sole occupant of the vehicle which was parked in an active driveway with the battery activated and the keys in the ignition, and he told police the vehicle was his and his reason for being there related to work. The police could reasonably infer that the van had arrived at that location by means of driving, and that Defendant had been the one to do it.
Finally, the premise of Defendant's argument is flawed. Although it is true that the vehicle was parked when police arrived, during the interaction, Defendant engaged the engine, shifted from park to drive, and caused the vehicle to lurch forward. In short, he drove, if extremely briefly.
Defendant's motion to dismiss the fruits of his arrest for lack of probable cause is denied.
Statements (Huntley)
To use a defendant's own statements against him at trial, the prosecution must prove beyond a reasonable doubt that the statements were made voluntarily and not obtained by means of coercion (People v Huntley, 15 NY2d 72, 78 [1965]). A defendant who is in custody may not be interrogated by law enforcement without being advised of his constitutional rights (Miranda v Arizona, 384 U.S. 436 [1966]). A defendant's custodial status is an objective inquiry which hinges on whether a reasonable person, innocent of any crime, would feel free to leave in defendant's circumstances (People v Yukl; 25 NY2d 585 [1969]). Interrogation refers to both express questioning and any words or actions by the police other than those ordinarily connected to arrest and custody that the police should know are reasonably likely to elicit an incriminating response (Rhode Island v Innis, 446 U.S.291, 301 [1980]).
To use a defendant's own statement as evidence at trial, the prosecution must give the defendant proper notice of the statement pursuant to CPL §710.30(1)(a). For notice to be proper, it must specify the time and place the statements were made and the sum and substance of the statements; the statements need not be transcribed verbatim, but they must be sufficiently described such that the defendant can intelligently identify them (People v Lopez, 84 NY2d 425, 428 [1994]). The purpose of the notice requirement is to afford the defendant an opportunity to challenge the voluntariness of the statements; "a defendant cannot challenge that of which he lacks knowledge" (People v Lopez, 84 NY2d at 428). "The obvious purpose of the statute is to afford a defendant adequate time in preparing his case in respect to the voluntariness of a [statement]" (People v Greer, 42 NY2d 170, 178 [1977]; People v Briggs, 38 NY2d 319, 323 [1975]). Inadequacy of a CPL §710.30 notice cannot be cured by discovery (Lopez at 428). The remedy for a lack of or improper notice is preclusion (CPL §710.30[3]).
As a preliminary matter, the Court finds that the Prosecution has met their burden of demonstrating that Defendant's statements were made voluntarily. There were only two police officers present, Officers Scaperotta and Terrell. Neither drew his gun, nor made any promises or threats to Defendant. Neither used physical force or restrained Defendant. The events were brief, lasting only a few minutes. The circumstances were not unduly coercive.
Defendant challenges the Prosecution's use of his statements on two fronts. First, he argues that the statement notice provided is statutorily deficient, so the statements referenced therein are subject to preclusion. Alternatively, he argues that they were presumptively involuntary and subject to suppression because Defendant was not advised of his Miranda rights.
From the outset, the Court acknowledges the inherent conflict in Defendant's argument. [*6]CPL §710.30(1)(a)'s notice requirement boils down to a defendant's ability to identity the statements the prosecution intends to use against him so he may challenge their admissibility (People v Lopez, 84 NY2d 425, 428 [1994]). It stands to reason that if a defendant can sufficiently identify the statements to argue they were presumptively involuntary, which Defendant has done, then the notice requirement is satisfied (see People v Kirkland, 89 NY2d 903 [1996]). As such, Defendant's motion to preclude the statements is uniformly denied.
Defendant argues he was in custody when police ordered him out of his vehicle because he was not free to leave. He also argues that the questions about whether he had been drinking, why he had been behind the wheel, and why he had been drinking were designed to elicit incriminating responses, making them an interrogation. Because Defendant did not receive Miranda warnings, he argues his statements to police were presumptively involuntary and should be suppressed.
Contrary to Defendant's characterization, roadside detentions are noncustodial in nature, during which police are permitted to engage in investigatory questioning (People v Mathis, 136 AD2d 746 [1988]). Courts have consistently ruled that during an interaction with someone suspected of operating a vehicle while intoxicated, police may ask whether he has been drinking without first issuing Miranda warnings (People v Mason, 157 AD2d 859 [1990]; People v Spencer, 289 AD2d 877 [2001]; People v McGreal, 190 AD2d 869 [1993]; People v Milo, 300 AD2d 680 [2002]). Here, Officer Scaperotta asked Defendant whether he had been drinking, when he drank, what he had been doing at the scene and prior to arriving, if he had any medical conditions, and similar questions. These questions were fundamentally investigatory in nature. The interaction took place in the gas station parking lot next to Defendant's vehicle. Defendant was not handcuffed or physically restrained in any way. The Court finds that Defendant was not subjected to custodial interrogation requiring Miranda warnings (People v Mathis, 136 AD2d 746; People v Lovelle, 33 Misc 3d 1212[A] [2011]).
Defendant's motion to suppress his statements is denied.

 CONCLUSION
For the reasons discussed above, Defendant's motion is DENIED in its entirety. This constitutes the decision and order of the Court.
Dated: August 6, 2024
Hon. Joshua Glick