**Christopher LEECAN,**
**Petitioner–Appellant,**

v.

**Raymond LOPES, Commissioner of**
**Correction, Respondent–Appellee.**

**No. 1376, Docket 89–2134.**

United States Court of Appeals,
Second Circuit.

Argued July 19, 1989.
Decided Jan. 11, 1990.

Richard Emanuel, Office of the Chief Public Defender, New Haven, Conn., for petitioner-appellant.

Judith Rossi, Asst. State's Atty., Office of the Chief State's Atty., Wallingford, Conn., for respondent-appellee.

Before WINTER and MAHONEY, Circuit Judges, and RE, Chief Judge.*

MAHONEY, Circuit Judge:

Petitioner-appellant Christopher Leecan appeals from the denial of his petition for a writ of habeas corpus by the United States District Court for the District of Connecticut, José A. Cabranes, *Judge*. The writ sought to overturn Leecan's conviction for felony murder in the state courts of Connecticut.

Leecan was convicted after a jury trial of the felony murder of Raymond Lovell. The murder occurred on or about December 10, 1980. Leecan surrendered to the New Haven police on March 4, 1981, whereupon he was arraigned and advised of his *Miranda* rights by the judge presiding at the arraignment. Leecan made no statement to the police regarding his involvement in or knowledge of the murder.

At trial, Leecan testified in his own behalf and presented for the first time a version of events exculpating him from the crime. On cross-examination, the prosecutor questioned Leecan about his prearrest silence in an effort to impeach Leecan's alibi. Leecan's response implied that he originally related his alibi to the police when he surrendered. The prosecutor challenged this implication through questions concerning Leecan's postarrest silence. The prosecutor returned briefly to the question of Leecan's postarrest silence during recross-examination of Leecan.

Leecan appealed to the Connecticut Supreme Court, contending that the cross-examination and recross-examination concerning his postarrest silence was prohibited by *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Leecan also argued that the jury instruction concerning reasonable doubt impermissibly lowered the State's burden of proof. The Connecticut Supreme Court affirmed his conviction, *State v. Leecan,* 198 Conn. 517, 504 A.2d 480, *cert. denied,* 476 U.S. 1184, 106 S.Ct. 2922, 91 L.Ed.2d 550 (1986), and the Supreme Court denied certiorari, *id.*

Leecan thereafter presented the same issues to the district court in a petition for habeas corpus. Affirming a recommended ruling by Magistrate Joan Glazer Margolis,[1] the district court denied the petition, ruling that (1) although *Doyle* had been violated, the error was harmless beyond a reasonable doubt; and (2) no constitutional error occurred in the jury instruction concerning reasonable doubt.

Leecan raises the same issues in his appeal to this court. We affirm the denial of the petition, but on a somewhat different ground with respect to the asserted *Doyle* violation, as to which we conclude that (1) no *Doyle* violation occurred during his cross-examination because Leecan invited the inquiry into his postarrest silence by responses implying that he told the police his alibi upon surrendering; and (2) any *Doyle* violation which occurred on recross-examination was harmless.

## *Background*

The Connecticut Supreme Court made the following recital concerning the evidence presented at Leecan's trial:

* The Honorable Edward D. Re, Chief Judge, United States Court of International Trade, sitting by designation.

1. The initial referral to the magistrate resulted in a recommended ruling that (1) there was no constitutional error in the jury instruction concerning reasonable doubt, and (2) although *Doyle* had been violated, the error was harmless in accordance with the standard articulated in *Greer v. Miller,* 483 U.S. 756, 765, 107 S.Ct. 3102, 3109, 97 L.Ed.2d 618 (1987). The district court remanded the case to the magistrate for reconsideration of the *Doyle* issue in light of the more stringent "harmless error" standard set forth in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and *Hawkins v. LeFevre,* 758 F.2d 866, 877–78 (2d Cir.1985). Upon remand, the magistrate recommended a ruling that the *Doyle* violations were "harmless beyond a reasonable doubt" within the meaning of *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828, and the district court accepted and adopted that recommendation.

The jury could reasonably have found from the evidence that on December 11, 1980, Raymond Lovell was found dead in his hotel room at the Holiday Inn in New Haven. He had been bound with handcuffs and a cord, gagged, his head covered with a pillow case, and beaten on the head with a blunt object, causing injuries that resulted in his death.

On December 8, 1980, three days before Lovell's body was discovered, the defendant had driven to New Haven from Philadelphia, accompanied by Lawrence Nowlin and Theresa Spencer. The defendant brought with him a set of handcuffs, a metal pipe and a handgun. Nowlin and Spencer testified in behalf of the state at the defendant's trial and provided most of the evidence of his involvement in the crime.

The trio spent the night of December 8 in New Haven at the home of an acquaintance of Spencer. They had initially intended to rob this person, but later abandoned the plan. On December 9, Spencer contacted Lovell, the victim, whom she had met previously while working for a magazine sales organization that also employed him. She spent that night with Lovell in his motel room.

The next day, December 10, she rejoined Nowlin and the defendant at the motel where they were then staying. The defendant, with Nowlin and Spencer, drove to the Holiday Inn where Lovell was staying. Lovell did not return to the motel until the late afternoon, at which time he spoke with Spencer about her returning to his room that evening.

The defendant, observing that Lovell wore expensive clothing and jewelry and drove a Cadillac, expressed his intention of robbing Lovell with the assistance of Nowlin and Spencer. The trio returned to the Holiday Inn at about 8 p.m. that evening. Spencer entered Lovell's room while Nowlin and the defendant remained in the car. After some period of time, Nowlin knocked on the door of the room and Spencer let him and the defendant into the room. The defendant used the bathroom and, when he emerged, he held a handgun. He demanded that Lovell give him his money and his drugs. Lovell was bound, gagged and blindfolded by placing a pillow case over his head. The defendant then struck Lovell several times on the head with an iron pipe. Assisted by Nowlin and Spencer, the defendant searched the room and removed some of Lovell's jewelry and clothing, which they placed in the trunk of the defendant's car. One of his accomplices drove Lovell's Cadillac and followed the defendant, who was driving his own car. After it had been searched, the Cadillac was abandoned on the Merritt Parkway. The trio then returned to Philadelphia.

*State v. Leecan,* 198 Conn. at 519–20, 504 A.2d at 483.

On or about January 15, 1981, Spencer was arrested in Miami on unrelated charges, and gave a statement implicating Leecan and Nowlin in the robbery and murder. On or about January 19, 1981, Nowlin surrendered to the Philadelphia police, to whom he gave a statement acknowledging his presence in Lovell's room during the night of the murder and implicating Leecan and Spencer in the crime.

An arrest warrant was issued for Leecan on January 20, 1981, and he surrendered to the New Haven police on March 4, 1981. He made no statement to the police. Petitioner has provided a transcript of his arraignment in the Superior Court of the State of Connecticut at New Haven on that date, indicating that he, together with an unspecified additional number of criminal defendants, was then given *Miranda* warnings in open court. The State of Connecticut does not dispute that this occurred.[2]

2. This transcript was apparently not presented to the Connecticut Supreme Court on Leecan's direct appeal from his conviction. Asked to take judicial notice of the probability that Leecan was given *Miranda* warnings at his arraignment in accordance with the standard practice in Connecticut state courts, the Connecticut Supreme Court said:

> We do not regard the advice given by a court or a clerk pursuant to these provisions as the functional equivalent of a *Miranda* warning given by the police prior to custodial interrogation. It is not as explicit, and is thus not so

As noted by the Connecticut Supreme Court, 198 Conn. at 519, 504 A.2d at 483, Nowlin and Spencer testified in behalf of the prosecution at Leecan's trial, and provided most of the evidence of Leecan's involvement in the crime. Both witnesses admitted that they had lied in prior statements concerning Lovell's murder. Both witnesses also admitted to drug use at the general time of the events in question, and Nowlin to alcohol abuse, as well. Nowlin had pleaded guilty, and Spencer had been found guilty after trial, prior to Leecan's trial, and both were awaiting the imposition of sentence when they testified against Leecan.

Leecan testified in his own behalf, relating an alibi that on the evening of the murder, he, Nowlin and Spencer had gone to a bar near the Holiday Inn where Lovell was staying. Eventually, Leecan asserted, Spencer and Nowlin left the bar and took Leecan's car to Lovell's motel to pick up Spencer's belongings and a paycheck. Leecan claimed that he stayed at the bar, and that when Nowlin and Spencer returned to the bar sixty to ninety minutes later, all three departed for Philadelphia. Leecan stated that he learned of the murder several weeks later, when the three were together in North Carolina.

During his cross-examination of Leecan, the prosecutor attempted to impeach Leecan's alibi as a recent fabrication.

The cross-examination included the following:

Q. So it's fair to say that by January 15, 1981, you knew this murder had taken place?

A. Yes.

Q. You were not under arrest?

A. No.

Q. You were free to move about?

A. Yes.

Q. You were free to come and go as you pleased?

A. Yes.

Q. But you never once went to the police, did you?

A. No, I didn't.

Q. You never once went to the police and said, "I'm innocent. I was sitting in a bar"?

A. No, I didn't.

* * * * * *

Q. Did you come forward to any authorities and say, "Look, I was sitting in a bar. I can help you on this thing"?

A. *Not until I turned myself in in March. No, I didn't.*

Q. *And in March, did you tell them that?*

A. *No, I didn't tell them anything. I was under the advice of an attorney.*

Q. *So you never said it until you were sitting here?*

A. *As a result of the advice of my attorney.*

Q. Well, sir, let me ask you this: From January 15 to the date of March 3, forgetting when you turned yourself in, up to March 3, did you ever go forward and say, "Hey, I've got some information concerning that accident that took place in New Haven"?

* * * * * *

A. No, I didn't.

* * * * * *

Q. And you did nothing to clear this case up, did you, during that period of time that you were free and roaming the streets?

A. *Not until I turned myself in, no sir.*

Q. *You didn't do anything then, did you?*

A. *Under the advice of an attorney, no sir.*

likely to induce silence in reliance upon it. Furthermore, the defendant in this case testified that he had disclosed nothing to the police, not because of any official warning received at arraignment or at any other time, but because his attorney advised him to remain silent. It appears, therefore, that neither the police nor any other government personnel can reasonably be deemed to have induced the defendant's postarrest silence, as is essential to support a claimed violation of *Doyle. Fletcher v. Weir,* [455 U.S. 603, 607, 102 S.Ct. 1309, 1312, 71 L.Ed.2d 490 (1982)]. 198 Conn. at 531, 504 A.2d at 488.

Q. Sir, when you told us that Theresa had said to you down in North Carolina, for the first time, that Nowlin and—she told you that Nowlin and the victim had had an argument, and Nowlin hit him with a pipe; and Terry took the chains, and they left; and Terry said, "I knew you hit him too hard." That's what you call an accident, a robbery and an accident?

A. Miss Spencer said that, but Mr. Nowlin is the one that said that he hit him, yes.

Q. And you, of course, came forward to give that information to help us find who perpetrated this crime?

A. I came to clear my name in this whole case, and I was under the advice of an attorney not to say anything or give any statements at that time.

Emphasis added.

Leecan's recross-examination included the following:

Q. Did you do one thing to clear your name right after you found out about this?

A. No, I didn't.

Q. In all of January?

A. No, sir, I didn't.

Q. In all of February?

A. No, sir, I didn't.

Q. March first?

A. No, sir.

Q. Second?

A. No, sir.

Q. Third?

A. No, sir.

Q. *And this is the first time you've told this story?*

A. Yes, sir.

*   *   *   *   *   *

Q. And there was nothing you ever did to clear your name right from the moment you heard the accusations against you *to the moment that you surrender [sic] to the day you testified*?

A. When you say "heard the accusations against me," I don't understand that.

Q. You didn't know that you had been accused in this case.?

A. Oh, yes.

Q. When did you first learn that?

A. When I was in North Carolina.

Q. And, of course, you called and said to the sheriff, "Hey, I've got some information that I want to get to the New Haven Police"?

A. No, sir, I didn't.

Q. You called the New Haven Police and said, "I'd like to talk to you guys"?

A. No, sir, I didn't.

Q. You called the State's Attorneys [sic] Office and said, "I'd like to talk to you"?

A. No.

*   *   *   *   *   *

Q. Now, you were asked whether you turned yourself in, and you did, is that correct?

A. Yes, sir, I did.

Q. But that was, in point of fact, in March of 1981, correct?

A. Yes, sir, it was.

*   *   *   *   *   *

Q. *When you came in, did you go to the police and tell them, "Look, I didn't have anything to do with this"?*

A. *I went to a lawyer first.*

Q. Did you tell him you didn't have anything to do with this?

A. What I discussed with my lawyer I don't feel as though I'm supposed to discuss here.

Emphasis added.

Defense counsel made no objection to any of the foregoing questions, on either cross-examination or recross-examination.

At the close of trial, the jury was given the following instruction concerning the concept of reasonable doubt:

Now, *a reasonable doubt* means this: It *is a doubt for which a reasonable man can give a valid reason.* The burden of proving the guilt of this man beyond a reasonable doubt requires the State to produce sufficient evidence to create in your minds a strong and abiding conviction of the guilt of the accused; in other words, as it is sometimes said,

and it is the law, that the evidence must be so sufficient that it would leave no room in your minds for any reasonable hypothesis of innocence of the accused.

A reasonable doubt is not a doubt raised by someone who questions for the sake of raising a doubt. It is not a surmise, a guess, a conjecture or an imaginary doubt. It is not a captious doubt, nor a doubt suggested by the ingenuity of counsel or a juror and unwarranted by the evidence, nor is it a doubt prompted by sympathy for anyone.

Absolutely [sic] certainty in the affairs of life is almost never attainable, and the law does not require absolute certainty to authorize a conviction. What it does require is that the guilt be established as charged beyond *a reasonable doubt,* which *is one founded on the evidence,* one which you, as reasonable and prudent men and women, would be willing to act upon in the more weighty and important matters relating to your own affairs. It is proof wholly consistent with the defendant's guilt and inconsistent with any other rational conclusion. If, upon any reasonable hypothesis, the evidence warrants a construction favorable to the accused, he is entitled to it and must be given the benefit of it by you as his triers.

Emphasis added. Defense counsel made no objection to this jury instruction.

Leecan was convicted of one count of felony murder in violation of Conn.Gen. Stat. § 53a–54c (1985). Leecan appealed to the Connecticut Supreme Court, arguing, *inter alia,* the same issues presented on this appeal. The conviction was affirmed, and the Supreme Court denied certiorari. *See State v. Leecan,* 198 Conn. 517, 504 A.2d 480, *cert. denied,* 476 U.S. 1184, 106 S.Ct. 2922, 91 L.Ed.2d 550 (1986).

Leecan then applied to the United States District Court for the District of Connecticut for a writ of habeas corpus. After an initial referral to a magistrate, an initial recommended ruling, and a remand to the magistrate, *see supra* note 1, the magistrate made a recommended ruling that (1) although *Doyle* violations had occurred in the examination of Leecan at trial, the resulting error was harmless; and (2) no constitutional error occurred in the jury instruction concerning reasonable doubt.[3] The district court accepted and adopted the supplemental recommended ruling of the magistrate, judgment was entered denying the writ of habeas corpus, and the district court issued a certificate of probable cause authorizing this appeal, as required by 28 U.S.C. § 2253 (1982); *see also* Fed.R. App.P. 22(b).

This appeal followed.

### *Discussion*

Leecan argues on appeal, first, that the district court erred in concluding that the *Doyle* violations were harmless error, and second, that his constitutional rights were violated by the trial court's instruction concerning reasonable doubt. We hold that no *Doyle* violation occurred during Leecan's cross-examination, and that any such violation that occurred during his recross-examination was harmless. We note in this regard that we are free to affirm an appealed decision on any ground which finds support in the record, regardless of the ground upon which the trial court relied. *Helvering v. Gowran,* 302 U.S. 238, 245, 58 S.Ct. 154, 158, 82 L.Ed. 224 (1937); *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987); *United States v. Lieberman,* 637 F.2d 95, 103 n. 11 (2d Cir.1980). We affirm the ruling of the district court that the jury instruction concerning reasonable doubt was not constitutionally defective.

3. In its initial recommended ruling, the magistrate raised the question whether Leecan had exhausted his state remedies, since he had not filed a petition for habeas corpus in the Connecticut state court system. The Supreme Court has ruled, however, that "once the state courts have ruled upon a claim, it is not necessary for a [habeas] petitioner 'to ask the state for collateral relief, based upon the same evidence and issues already decided by direct review,'" *Castille v. Peoples,* — U.S. —, 109 S.Ct. 1056, 1059, 103 L.Ed.2d 380 (1989) (quoting *Brown v. Allen,* 344 U.S. 443, 447, 73 S.Ct. 397, 402, 97 L.Ed. 469 (1953)); *see also Dean v. Smith,* 753 F.2d 239, 241 n. 4 (2d Cir.1985).

A. *Postarrest Silence.*

Due process is not violated when a defendant who testifies in his own behalf is impeached with his prior silence. *Raffel v. United States,* 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926). The Supreme Court carved out an exception to this rule, however, in *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), where it held that the due process clause of the fourteenth amendment was violated by the use of the defendant's silence, at the time of arrest and after receiving *Miranda* warnings, to impeach exculpatory testimony given for the first time at trial. *Id.* at 619, 96 S.Ct. at 2245. The Court there stated:

> Despite the importance of cross-examination, we have concluded that the *Miranda* decision compels rejection of the State's position. The warnings mandated by that case, as a prophylactic means of safeguarding Fifth Amendment rights, require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

*Id.* at 617–18, 96 S.Ct. at 2244–45 (footnotes and citations omitted).

In *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), the Court elaborated further on the *Doyle* rationale:

> *Miranda* warnings inform a person that he has the right to remain silent and assure him, at least implicitly, that his subsequent decision to remain silent cannot be used against him. Accordingly, " 'it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony.' "

*Id.* at 239–40, 100 S.Ct. at 2129–30 (quoting *Doyle,* 426 U.S. at 619, 96 S.Ct. at 2245) (in turn quoting *United States v. Hale,* 422 U.S. 171, 182–83, 95 S.Ct. 2133, 2139–40, 45 L.Ed.2d 99 (1975) (White, J., concurring in the judgment)). Further, the Court stated in *Anderson v. Charles,* 447 U.S. 404, 408, 100 S.Ct. 2180, 2182, 65 L.Ed.2d 222 (1980), that "*Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances."

In deciding whether the inquiry into Leecan's postarrest silence violated *Doyle,* we note at the outset our agreement with the ruling of the magistrate and the district court that Leecan did, in fact, effectively receive *Miranda* warnings. The admonition Leecan concededly received from the judge at arraignment in open court, addressing a group of arrestees, is not materially distinguishable for *Doyle* purposes from a warning delivered by police prior to a custodial interrogation. *See State v. Lofquest,* 227 Neb. 567, 568, 418 N.W.2d 595, 596 (1988) (*Miranda* warnings given by county judge at arraignment invoke *Doyle* protections); *State v. Gooding,* 110 Idaho 856, 863, 719 P.2d 405, 412 (Idaho Ct.App. 1986) (Burnett, J., specially concurring) (*Miranda* warnings given by magistrate trigger *Doyle* rule). It seems to us that silence in the wake of *Miranda* warnings issued in such circumstances may result from the exercise of an arrestee's *Miranda* rights, just as in the case of warnings issued by a police officer. We note our disagreement concerning this issue with the view taken by the Connecticut Supreme Court on Leecan's direct appeal. *See supra* note 2.

Unlike the magistrate and the district court, however, we find no violation of *Doyle* during Leecan's cross-examination. Rather, we agree with the Connecticut Supreme Court that no such violation occurred during Leecan's cross-examination because Leecan invited the inquiries into his postarrest silence through responses which implied that he had told the police his exculpatory story when he surrendered on March 4, 1981.[4] The Court in *Doyle* explained that postarrest silence could be used for impeachment in such instances.

> It goes almost without saying that the fact of postarrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest.

*Doyle,* 426 U.S. at 619 n. 11, 96 S.Ct. at 2245 n. 11 (citation omitted).

In this case, the prosecutor commenced his cross-examination concerning Leecan's prior silence by inquiring into Leecan's *prearrest* silence. This was clearly proper. *Jenkins v. Anderson,* 447 U.S. 231, 240, 100 S.Ct. 2124, 2130, 65 L.Ed.2d 86 (1980). In the course of that interrogation, the following exchange occurred:

> Q. Did you come forward to any authorities and say, "Look, I was sitting in a bar. I can help you on this thing"?
>
> A. Not until I turned myself in in March. No, I didn't.

The clear implication of this answer was that when Leecan surrendered in March, he had told the police his version of the crime. This situation therefore falls squarely within the exception stated in *Doyle* footnote 11, quoted immediately *supra.*

The prosecutor then asked two questions to dispel the implication that Leecan had proffered his alibi to the police at the time of his surrender, as follows:

> Q. And in March, did you tell them that?
>
> A. No, I didn't tell them anything. I was under the advice of an attorney.
>
> Q. So you never said it until you were sitting here?
>
> A. As a result of the advice of an attorney.

Similarly, as the cross-examination proceeded and the prosecutor resumed his concededly legitimate inquiry concerning Leecan's *prearrest* silence, the following exchange occurred:

> Q. And you did nothing to clear this case up, did you, during that period of time that you were free and roaming the streets?
>
> A. Not until I turned myself in, no sir.

4. The Connecticut Supreme Court addressed this issue as follows:

> It was not until the defendant, in response to a question that appears to have been related to his pre-arrest silence, declared that he had not "come forward" and given his information to the police "until I turned myself in in March" that the prosecutor asked his first questions about postarrest silence. The implication of the defendant's answer, in the absence of clarification by these questions, was that he had revealed what he knew about the murder at the time he surrendered to the police or thereafter. "It goes almost without saying that the fact of postarrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest." *Doyle v. Ohio,* supra, at 619 n. 11, 96 S.Ct. at 2245 n. 11. In this case the defendant's unsolicited response that he had given no information about the crime "until" he was taken into custody falls within the parameters of this exception to the prohibition against use of postarrest silence. The follow-up questions focusing upon the period after the arrest were essential in order to clarify the ambiguous response of the defendant. On the two later occasions, when a series of questions concerning his pre-arrest silence included single references also to his postarrest silence, the defendant cannot be said to have invited these postarrest inquiries by his responses. Since these questions were merely repetitious of those asked following the defendant's initial ambiguous response, however, we conclude that the later inquiries were harmless beyond a reasonable doubt.

198 Conn. at 532–33; 504 A.2d at 489.

The prosecutor then asked a single question to dispel the implication of Leecan's answer, as follows:

Q. You didn't do anything then, did you?

A. Under the advice of an attorney, no sir.

We conclude that the foregoing brief inquiries on cross-examination concerning postarrest silence were warranted by Leecan's testimony, which would otherwise have left the clear implication that he had proffered his alibi to the police upon surrender, and fall clearly within the exception to the *Doyle* rule stated in *Doyle* footnote 11.

■ We turn to Leecan's recross-examination, which included the following exchanges:

Q. And this is the first time you've told this story?

A. Yes, sir.

* * * * * *

Q. And there was nothing you ever did to clear your name right from the moment you heard the accusations against you to the moment that you surrender [sic] to the day you testified?

* * * * * *

Q. When you came in, did you go to the Police and tell them, "Look, I didn't have anything to do with this"?

A. I went to a lawyer first.

Q. Did you tell him you didn't have anything to do with this?

A. What I discussed with my lawyer I don't feel as though I'm supposed to discuss here.

Standing alone, these exchanges would raise substantial *Doyle* problems. Arguably, however, the prior similar exchanges on cross-examination had opened the door to this relatively brief inquiry during a recross-examination that was primarily directed to the legitimate area of Leecan's prearrest silence, as had been the pertinent cross-examination. On the other hand, the prior exchanges had a legitimate curative purpose, and the assertions by Leecan which gave rise to that purpose were not repeated on recross-examination. In any event, assuming that the inquiries on recross-examination constituted error, since the legitimate exchanges on cross-examination had put the question of Leecan's postarrest silence fully before the jury, we regard the brief revisitation of the subject on recross-examination as harmless beyond a reasonable doubt because not "contribut[ing] to the verdict obtained." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). *See* the similar views of the Connecticut Supreme Court, *supra* note 4. In so ruling, we should not be understood to have endorsed the magistrate's conclusion, affirmed by the district court, that both the cross-examination and recross-examination at issue constituted *Doyle* violations which were nonetheless harmless. *See supra* note 1. In view of our disposition of the *Doyle* issue, we do not reach the question of harmless error with respect to the cross-examination of Leecan.

We also need not pass upon the State of Connecticut's alternative argument that the cross-examination into Leecan's postarrest silence did not violate his constitutional rights because Leecan was silent upon the advice of his attorney, rather than as a result of the inducement of the *Miranda* warnings and the implicit assurance contained therein. The Connecticut Supreme Court apparently endorsed this view, *see supra* note 2, and the dissent in *Doyle* stressed that the defendants in that case did not offer reliance on *Miranda* warnings as the cause of their postarrest silence. *See Doyle,* 426 U.S. at 622–24, 96 S.Ct. at 2246–48 (Stevens, J., dissenting). The majority, however, found the absence of such reliance unpersuasive as a basis for decision, stating:

> The dissenting opinion relies on the fact that petitioners in this case, when cross-examined about their silence, did not offer reliance on *Miranda* warnings as a justification. But the error we perceive lies in the cross-examination on this question, thereby implying an inconsistency that the jury might construe as evidence of guilt. After an arrested person is formally advised by an officer of

the law that he has a right to remain silent, the unfairness occurs when the prosecution, in the presence of the jury, is allowed to undertake impeachment on the basis of what may be the exercise of that right.

*Doyle,* 426 U.S. at 619 n. 10, 96 S.Ct. at 2245 n. 10.

B. *The Jury Instruction concerning Reasonable Doubt.*

Leecan contends that the instructions on reasonable doubt were constitutionally defective both in defining a reasonable doubt as "a doubt for which a reasonable man can give a valid reason," and in asserting that a reasonable doubt "is one founded on the evidence," without any recognition that a reasonable doubt might be premised upon a *lack* of evidence.

Leecan argues that the definition of reasonable doubt as "a doubt for which a reasonable man can give a valid reason" contravenes due process by imposing a burden upon jurors that tends to invite convictions on evidence falling below the constitutional standard. Leecan points to judicial criticism of such a definition of reasonable doubt. *See, e.g., Adams v. South Carolina,* 464 U.S. 1023, 1023–26, 104 S.Ct. 558, 560, 78 L.Ed.2d 730 (1983) (Marshall, J., dissenting from denial of certiorari); *Butler v. South Carolina,* 459 U.S. 932, 103 S.Ct. 242, 74 L.Ed.2d 191 (1982) (Marshall, J., dissenting from denial of certiorari).

This instruction, however, has survived challenge in this circuit both on direct appeal and in a habeas context. *See, United States v. Kelly,* 349 F.2d 720, 764 (2d Cir. 1965) (approving on direct appeal instruction that reasonable doubt is "a doubt for which a reason can be given"), *cert. denied,* 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966); *United States v. Davis,* 328 F.2d 864, 867–68 (2d Cir.1964) (ruling, on direct appeal, such an instruction "not erroneous" although "not approved" and "perhaps unwise"); *Barber v. Scully,* 557 F.Supp. 1292, 1296 (S.D.N.Y. 1983) (rejecting habeas challenge to such an instruction on authority of *United States v. Davis*), *aff'd,* 731 F.2d 1073 (2d Cir.1984).

Similarly, this court has explicitly sustained, on direct appeal, a refusal to charge that a reasonable doubt may be founded on a lack of evidence, as well as upon the evidence, despite an explicit request to do so. *See United States v. Caruso,* 358 F.2d 184, 186–87 (2d Cir.), *cert. denied,* 385 U.S. 862, 87 S.Ct. 116, 17 L.Ed.2d 88 (1966); *Foran v. Metz,* 463 F.Supp. 1088, 1092 (S.D.N.Y.) (same ruling in habeas context, following *Caruso*), *aff'd mem.,* 603 F.2d 212 (2d Cir.), *cert. denied,* 444 U.S. 830, 100 S.Ct. 58, 62 L.Ed.2d 38 (1979); *cf. United States v. Rinaldi,* 301 F.2d 576, 578 (2d Cir.1962) (sustaining instruction that "reasonable doubt must arise out of something tangible in the evidence;" no objection to instruction at trial).

We are asked in this case to rule that the challenged instructions were not only erroneous, but constitutionally defective, in a case where no objection was made to them at trial in the state court. We decline to do so. We note initially that this panel has no authority to depart from Second Circuit precedent unless it has been overruled in banc or by the Supreme Court. *See United States v. Salerno,* 868 F.2d 524, 534 (2d Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 3192, 105 L.Ed.2d 700 (1989); *Board of Educ. of City School Dist. v. Hufstedler,* 641 F.2d 68, 70 (2d Cir.1981); *In re Jaylaw Drug, Inc.,* 621 F.2d 524, 527 (2d Cir.1980). Further, as the Supreme Court stated in *Henderson v. Kibbe,* 431 U.S. 145, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977):

> The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. The question in such a collateral proceeding in "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process", *Cupp v. Naughten,* 414 U.S., [141] at 147, 94 S.Ct., [396] at 400, 38 L.Ed.2d 368, not merely whether "the instruction is unde-

sirable, erroneous, or even 'universally condemned,' " *id.*, at 146, 94 S.Ct., at 400. *Id*, 431 U.S. at 154, 97 S.Ct. at 1736 (footnote omitted). Finally, "[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." *Id.*

For all these reasons, we find no basis for habeas relief in the challenge to the instruction on reasonable doubt.

### Conclusion

The judgment of the district court is affirmed.