Marc A. MADORE, Petitioner,

v.

John BEAVER, Superintendent,
Orleans Correctional Facility,
Respondent.

No. 02–CV–6341.

United States District Court,
W.D. New York.

Jan. 5, 2005.

Marc A. Madore, Orleans Correctional Facility, Albion, NY, pro se.

Thomas H. Brandt, District Attorney's Office, Lockport, NY, for Defendant.

## DECISION AND ORDER

BIANCHINI, United States Magistrate Judge.

## INTRODUCTION

Marc A. Madore ("Madore") filed this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in Niagara County Court on one count of first degree assault. The parties have consented to disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(b).

## FACTUAL BACKGROUND

The conviction here at issue arose from the stabbing of Harry Printup ("Printup") on March 7, 1998, in the City of Niagara Falls. Printup spent the evening bar-hopping with some friends. After the bars closed at 3:00 a.m., Printup and his friends went to the apartment of Paul Joseph ("Joseph") and Becky Horning at 1902 Cudaback Avenue where they continued drinking. At about 4:00 a.m., Printup left the apartment to go to relieve himself. As he stepped outside, he saw Madore, whom he had known for twelve years, lunge at him. Printup did not see anything in Madore's hands and thought that Madore was punching him. However, Printup then noticed that he was bleeding from his chest. Printup was able to push Madore off of him and stumble back into the apartment to inform his friends what had happened. Joseph chased after Madore for a few blocks but then lost sight of him.

When the police arrived, they found Printup lying on the ground with multiple stab wounds in his chest.[1] A K–9 unit and

---

1. Printup survived the assault but was left with scarring and some residual pain in his chest area.

an ambulance arrived soon thereafter, and the police dog detected a scent trail leading from the crime scene to a house at 1744 Cudaback Avenue, Madore's residence. As the police prepared to surround the house, Officer Rizzo spotted a silhouetted figure move between two nearby homes and then dive into some bushes. Officer Rizzo trained his gun on the person in the bushes until other officers arrived. Officer Larabee yanked the person out of the bushes by grabbing hold of his hair. The officers handcuffed the individual and asked him what his name was. The man replied that his name was Mark Madore. According to Lieutenant Prucnal, Madore immediately said, "I didn't to anything." Lieutenant Prucnal then asked Madore, "Then why are you hiding?" Madore allegedly replied, "Indians jumped me, it was four on one, what was I supposed to do, they threatened my family." *See* H.4–5.[2] Two knives later were found in the vicinity, a kitchen knife and a hunting knife. However, the forensics examination yielded no fingerprints or traces of blood on either knife.

On June 17, 1998, a Niagara County Grand Jury indicted Madore on one count of second degree attempted murder (N.Y. Penal Law § 125.25(1)) and two counts of first degree assault (N.Y. Penal Law § 120.10(1), (3)). A *Huntley* hearing was held on September 18, 1999, to determine the admissibility of Madore's statements to the police. The court determined that although Madore's statements were made while he was in custody, they were not made in response to questions designed to coerce a statement. Rather, the officer's question was intended to clarify the situation in an ongoing criminal investigation.

*See* Respondent's of Law at 3 (Docket # 8) (citing "Appendix on Appeal at 12–14").

Madore's jury trial was held on January 26 through January 29, 1999, in Niagara County Court (Broderick, J.). On the second day of trial, the court dismissed one of the counts of first degree assault.

Madore testified in his behalf that he had stabbed Printup in self-defense. According to Madore, he was walking home when someone jumped out behind him and put him in a choke-hold. He was able to twist around to see that it was Printup who grabbed him. Madore testified that he could not breathe and that he thought he was going to die. He reached into his pocket, and pulled out his key ring which had a jack-knife attached to it, and started stabbing at Printup's chest area until Printup loosened his grip on him. *See* T.344–46.[3] When asked why Printup would have attacked him, Madore testified that the only incident between them was a fist-fight at a bar that occurred a couple of months before the March 7th assault. According to Madore, they were fighting over Madore's father's machete which Madore had loaned to Printup; apparently, Printup lost the knife and Madore was angry at him. Madore testified, however, that Printup started the fist-fight in the bar. *See* T.356–59. Madore did not sustain any scratches, bruises or other injuries as a result of the incident on the night of March 7, 1998.

Printup testified that he was unarmed at the time he was stabbed; although he typically carried a knife with him, he claimed that he had left it inside the apartment before he went out to relieve himself. The jury returned a verdict acquitting Ma-

---

**2.** Citations to "H. __" refer to the transcript of the hearing held pursuant to *People v. Huntley*, 15 N.Y.2d 72, 78, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965), on September 18, 1998.

**3.** Citation to "T. __" refer to the trial transcript.

dore of attempted second degree murder and convicting him of the remaining count of first degree assault.

Madore was sentenced as a second felony offender and a first-time violent felony offender to a sentence of three to six years incarceration. This indeterminate sentence, however, was illegal. Therefore, on March 31, 1999, the court re-sentenced Madore to a determinate sentence of eight years.

Through counsel, Madore appealed his conviction to the Appellate Division, Fourth Department, of New York State Supreme Court. That court unanimously affirmed the conviction on December 21, 2001. *People v. Madore,* 289 A.D.2d 986, 735 N.Y.S.2d 320 (4th Dept.2001). The New York Court of Appeals denied leave to appeal on March 25, 2002. *People v. Madore,* 97 N.Y.2d 757, 742 N.Y.S.2d 617, 769 N.E.2d 363 (2002). Madore filed the instant habeas petition in this Court on June 19, 2002. Respondent concedes that all of the claims for relief raised in Madore's petition have been exhausted and are properly before this Court. *See* 28 U.S.C. § 2254(b)(1). For the reasons set forth below, the petition is denied.

## DISCUSSION

### Standard of Review

In this case, as in all habeas petitions brought after the enactment of the Antiterrorism and Effective Death Penalty Act on April 24, 1996, a Federal court cannot grant habeas relief where there was an adjudication on the merits in a state court proceeding unless the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see also Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

### Merits of the Petition

### Claims I and II. Erroneous Denial of Mistrial Motion and Prosecutor's Improper Use of Post–Arrest Silence

Madore contends that the prosecutor committed misconduct when he commented upon Madore's invocation of his right to counsel and that the trial court erred in denying Madore's mistrial motion on this ground. Respondent alleges that these claims are procedurally defaulted and without merit.

▬ Federal habeas review of a State conviction is prohibited where the State court judgment is based on an "adequate and independent State ground," such as a procedural bar rule. *Harris v. Reed,* 489 U.S. 255, 261, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). In order to overcome a finding of procedural default, the habeas petitioner must show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the Federal claim will result in a fundamental miscarriage of justice. *Harris v. Reed,* 489 U.S. at 262, 109 S.Ct. 1038 (citations omitted); *see also, e.g., Schlup v. Delo,* 513 U.S. 298, 314–16, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).

On direct appeal, the Appellate Division held that the "belated mistrial motion by defendant did not preserve for our review his contention that he was denied a fair trial by a comment made by the prosecutor on summation." *People v. Madore,* 289 A.D.2d at 986, 735 N.Y.S.2d 320 (citing *People v. Warrick,* 261 A.D.2d 152, 690 N.Y.S.2d 194 (1st Dep't 1999); *People v. Valez,* 256 A.D.2d 135, 682 N.Y.S.2d 162 (1st Dep't 1988) ("Defendant's claims of prosecutorial misconduct in summation were not preserved for appellate review by defendant's belated motion for a mistrial made at the conclusion of summations[.]"), *lv. denied* 93 N.Y.2d 879, 689 N.Y.S.2d 441,

711 N.E.2d 655 (1999)). In any event, the Appellate Division held, the trial judge's curative instruction was sufficient to cure any alleged error. *Id.* (citations omitted).

 Under New York law, in order to preserve his claims for appellate review, Madore was required to raise his challenges to the prosecutor's summation by specifically objecting to the allegedly improper remarks, and, if his objections were sustained, requesting further relief from the trial court. *See, e.g., People v. Medina,* 53 N.Y.2d 951, 953, 441 N.Y.S.2d 442, 442–43, 424 N.E.2d 276 (1981) ("Defendant's ... contention that the convictions should be reversed because of certain of the prosecutor's summation remarks is ... without merit. The Trial Judge ultimately sustained defense counsel's objection to the District Attorney's comments and directed the District Attorney to refrain from making further statements on the same subject. Defense counsel did not request any curative instruction or move for a mistrial on the basis of the remarks that were made before the Trial Judge's ruling. Hence, no error of law was preserved for appellate review."); *see also Simpson v. Portuondo,* No. 01 Civ. 1379, 2001 WL 830946, at *11 n. 38 (S.D.N.Y. July 12, 2001) (citing New York cases). This Court's review of the pertinent case law demonstrates that New York courts regularly rely upon this procedural rule as a basis for finding that prosecutorial claims are not preserved for appellate review. At Madore's trial, defense counsel did not contemporaneously object to the prosecutor's comment, and he did not request a mistrial until after summations were completed. The Appellate Division's finding of procedural default thus is supported by the record, and its alternative holding on the merits does not change this result. "[A] state court need not fear reaching the merits of a federal claim in an *alternative* holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law." *Harris,* 489 U.S. at 264 n. 10, 109 S.Ct. 1038 (emphasis in original); *see also Velasquez v. Leonardo,* 898 F.2d 7, 9 (2d Cir.1990).

Because there has been an adequate and independent finding by the Appellate Division that Madore procedurally defaulted on his claim that prosecutorial misconduct warranted the grant of a mistrial, Madore would have to show in his habeas petition "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *see also, e.g., Schlup v. Delo,* 513 U.S. at 324–27, 115 S.Ct. 851 (fundamental miscarriage of justice may be demonstrated by showing through "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial," that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence"). Madore has failed to allege cause and prejudice or that a fundamental miscarriage of justice would result if his claims are not addressed.

In any event, even if the claims were not procedurally defaulted, I would dismiss them as being without merit. Some background to the prosecutor's comment in summation first is necessary in order to dispose of the claim. During the prosecutor's cross-examination of Madore, the following exchange occurred:

Q: Did you tell the police, Harry Printup just grabbed me by the neck?

A: No, I requested to see a lawyer.

Q: Did you tell the police that this raving lunatic, Harry Printup, had you in such a death grip that you had to stab him in order to get away?

A: No, sir.

Q: Eventually back at the police station you did ask for your lawyer like you said, correct?

A: Yes.

Q: I want my lawyer, take me to my bench?

Defense Counsel: I'm going to object to that, your Honor, and I ask that it be stricken. There's been a prior ruling on this.

The Prosecutor: The witness referred to it.

The Court: I'm sorry, read the question back.

The Court: It's sustained.

The Prosecutor: Judge, it's in response to the witness' own testimony. I didn't bring it out.

The Court: The objection is sustained.

Defense Counsel: Thank you.

The Court: Strike the question.

T.384–86.

Later, on summation, defense counsel stated,

Now, there are some questions that [the prosecutor] raised in his cross-examination of Mr. Madore. Why didn't Mr. Madore tell anybody about the way this encounter happened? Well, you didn't hear any evidence that the police or anyone else asked him for that explanation.

T.449.

The prosecutor, during his closing argument, remarked to the jury,

[Defense counsel] mentioned this, why didn't Madore tell anybody? He was talking about what I asked [Madore]. Why didn't Madore tell anybody? [Madore] says because he wasn't asked. I thought I heard the defendant testify that he asked for an attorney, but that's up to you. He asked for an attorney, that stops. Don't give me this[,]["]they didn't ask him, well gees [sic] sir, were you attacked by [the victim], were you strangled?["] He asked for a lawyer.

T. 469–70. Defense counsel made no objection at this time.

The Supreme Court has held that the prosecution cannot "use for impeachment purposes" a criminal defendant's post-arrest silence. *Greer v. Miller,* 483 U.S. 756, 763, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) (citing *Doyle v. Ohio,* 426 U.S. 610, 618, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) ("[W]hile it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial."). "However, when 'the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest,' prosecutorial comment is permissible." *United States v. Matthews,* 20 F.3d 538, 552 (2d Cir.1994) (quoting *Doyle,* 426 U.S. at 619–20 n. 11, 96 S.Ct. 2240) ("It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest.") & citing *Leecan v. Lopes,* 893 F.2d 1434, 1442 (2d

Cir.) (find that "brief inquiries on cross-examination concerning postarrest silence were warranted by [defendant's] testimony, which would otherwise have left the clear implication that he had proffered his alibi to the police upon surrender"), *cert. denied*, 496 U.S. 929, 110 S.Ct. 2627, 110 L.Ed.2d 647, (1990)). Thus, although comment on a defendant's silence is "usually improper," such comment "may be permissible when the defendant, by the impression he has sought to create, has opened the door." *Matthews*, 20 F.3d at 552.

■ It does not appear from the trial record that the prosecution was attempting to use Madore's post-arrest silence to impeach Madore or to imply that Madore had a "consciousness of guilt." In response to questioning by the prosecutor as to whether he ever had told the police that Printup had tried attack him, Madore himself stated that he asked for his lawyer. Thus, Madore "opened the door," so to speak, and defense counsel arguably opened it further when he tried to explain the fact that Madore did not tell the police that he had been attacked by Printup by observing that Madore never was asked for his side of the story. The prosecution apparently was attempting to dispel this suggestion by noting that the police lawfully could not ask Madore any questions after he requested an attorney. *See* T.480–81.

Even if the prosecutor's comment was improper, the trial court's curative instruction[4] was adequate to prevent any prejudice from accruing to Madore, especially given the circumstance of how the reference originally arose. *Cf. Matthews*, 20 F.3d at 552–53 (prosecutor elicited testimony from officer that after defendant initially agreed to take lie detector test, he then asked for his attorney; court held that the remarks appear to have been offered simply as a specific rebuttal to [defendant's] attempt to create the impression that he had been unqualifiedly willing to take a lie detector test: "Given the background and brevity of the comment and the delivery of the curative instruction, we conclude beyond a reasonable doubt that any impropriety in the comment did not cause [the defendant] any substantial prejudice."). A mistrial was not warranted, and the trial court did not err in denying defense counsel's belated request for one.

## Claim III. Custodial statements were inadmissible due to lack of *Miranda* warnings

Madore contends that the statements he made in reply to Lieutenant Prucnal's query, "Why are you hiding?" were in response to a custodial interrogation and should have been suppressed as having been made in the absence of *Miranda* warnings. The suppression court found that although Madore's statements were made while he was in police custody, they were not the result of a question intended to coerce a statement. Rather, the court found, Lieutenant Prucnal's question was "designed to clarify the situation in an ongoing criminal investigation." Respondent's Memorandum of Law at 3 (Docket

---

4. "You have heard some comment in the prosecutor's summation yesterday referring to the defendant's request for an attorney at the time of his arrest. It is never proper to suggest that such a request somehow evidences some sort of guilt. I tell you now as a matter of law that it is absolutely no evidence of guilt at all. It is every citizen's right when questioned by the police to request to speak with a lawyer. It is a constitutional right. You cannot and must not penalize a person for exercise [*sic*] such a right. If you did, then the right is meaningless and worthless. I instruct you as a matter of law that you may not infer any degree of guilt or wrongdoing based upon this request to speak with counsel." T.504–05.

# 8). On direct appeal, the state court held that Madore's motion to suppress the statements correctly had been denied:

> The police found defendant hiding in the bushes while they were searching for the person responsible for the assault, and their inquiries concerned the identity of defendant and his reason for hiding. Those inquiries were "designed to clarify the nature of the situation confronted, rather than to coerce a statement" (*People v. Huffman*, 41 N.Y.2d 29, 34, 390 N.Y.S.2d 843, 359 N.E.2d 353 [(1976)]). Thus, *Miranda* warnings were not required (*see, People v. Walker*, 267 A.D.2d 778, 779–80, 701 N.Y.S.2d 166, [(3d Dep't 1999)], *lv. denied* 94 N.Y.2d 926, 708 N.Y.S.2d 366, 729 N.E.2d 1165 [(2000)]); *People v. Albano*, 124 A.D.2d 739, 508 N.Y.S.2d 243 [(2d Dep't 1986)], *lv. denied* 69 N.Y.2d 824, 513 N.Y.S.2d 1030, 506 N.E.2d 541 [(1987)].

*People v. Madore*, 289 A.D.2d at 986, 735 N.Y.S.2d 320.[5]

■ There is no question that the suppression court correctly found that the statements made by Madore were in response to custodial interrogation. A court evaluating whether a person is in custody for *Miranda* purposes must consider "the circumstances surrounding the interrogation; and . . . given those circumstances would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.'" *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). Clearly, Madore was not free to leave; he was in handcuffs, surrounded by several police officers and a police dog. "The act of interrogation en-

compasses 'express questioning or its functional equivalent;'" words or actions of the police that are "'reasonable likely to elicit an incriminating response'" are regarded as tantamount to direct questioning. *United States v. Gelzer*, 50 F.3d 1133, 1138 (2d Cir.1995) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)). Madore's statements were in direct response to a question expressly posed by Lieutenant Prucnal. The Appellate Division nevertheless found that *Miranda* warnings were not required because the question was not intended to elicit an incriminating response.

There is no Federal analog to New York's "suspicious situation" exception to the requirement that *Miranda* warnings be issued prior to custodial interrogation. In *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), the Supreme Court articulated the so-called "public safety" exception to the *Miranda* rule. There, police officers in hot pursuit of a rape suspect armed with a firearm apprehended the apparent perpetrator, who was wearing an empty shoulder holster, in a supermarket. A police officer handcuffed the defendant Quarles and, without giving *Miranda* warnings, "asked [him] where the gun was." *Id.* at 652, 104 S.Ct. 2626. Quarles nodded his head in the direction of "some empty cartons" and said, "[T]he gun is over there." *Id.*

Reversing the state courts' suppression of Quarles's statement, a five-four majority of the Supreme Court held that "*on these facts*, there is a 'public safety' exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence." *Id.* at 655, 104

---

**5.** The "suspicious situation" exception set forth in *People v. Huffman* allows an officer to ask threshold crime scene inquiries of an accused who is in custody so long as the questions are designed not to elicit inculpatory responses but to clarify the situation with

which the investigating officers are presented. *See* 41 N.Y.2d at 34, 390 N.Y.S.2d 843, 359 N.E.2d 353; *accord People v. Bennett*, 121 A.D.2d 113, 510 N.Y.S.2d 209 (3d Dep't 1986); *People v. Booker*, 66 A.D.2d 474, 479, 414 N.Y.S.2d 420 (4th Dep't 1979).

S.Ct. 2626 (emphasis supplied). The Supreme Court based what it termed a "narrow exception to the *Miranda* rule," *id.* at 658, 104 S.Ct. 2626, on the exigencies of the "kaleidoscopic situation," *id.* at 657, 104 S.Ct. 2626, facing the officers who, as they apprehended Quarles, were "confronted with the immediate necessity of ascertaining the whereabouts of a gun" that Quarles had removed from his holster and tossed aside in a public place where "an accomplice might make use of it" or "a customer or employee might later come upon it," *id.* Finding that the situation "obviously posed more than one danger to the public safety," the majority of the justices essentially performed a cost-benefit analysis in order to "conclude that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* In the Supreme Court's opinion, to inform Quarles about his *Miranda* rights might have discouraged him from making statements to the police that would enable them to locate the fire arm before it posed a danger to the general public. *Id.* at 657, 104 S.Ct. 2626.

In *Quarles*, the majority noted that the officer who interrogated the petitioner "needed an answer to his question not simply to make his case against Quarles but to insure that further danger to the public did not result from the concealment of the gun in a public area." *Id.* at 657, 104 S.Ct. 2626. The officers who yanked Madore out of the bushes, however, were not presented with a situation akin to that in *Quarles* where a possibly loaded gun had been discarded in a public place. Nor did the officers have reason to believe that the weapon used in the assault was in danger of falling into the wrong hands. Furthermore, Madore was completely restrained and under the officers' control; there were no allegations at the *Huntley*

hearing that the officers were afraid that Madore could have injured them. In short, the circumstances surrounding Madore's apprehension could not reasonably be described as posing a threat to the public safety. I would be inclined to find, therefore, that the Appellate Division unreasonably applied the narrow "public safety" exception set forth in *Quarles*, which is the clearly established precedent at issue in this case.

■ However, even if the court erred in admitting Madore's un-*Mirandized* statements to the police, the error was harmless under any standard. First of all, to the extent that Madore's statement contained an implicit admission that he had attacked someone, I note that Madore never denied that he stabbed Printup. Rather, Madore contended that he stabbed Printup in self-defense. Moreover, Madore's reply to Lieutenant Prucnal's question clearly was intended to be exculpatory: his statements that he had been "jumped" by "four Indians" and that his family had been threatened amounted to a theory of self-defense, a theory which Madore argued, in slightly different form, to the jury at his trial. Arguably, Madore's story of being attacked by four individuals and having to defend himself because he feared for his family's safety might have been more persuasive than the version that he offered at trial-that one person, Printup, jumped him for no apparent reason. In any event, I note, however, that the jury accepted Madore's claim that he did not intend to kill Printup since it acquitted him of the attempted murder charge. Finally, the evidence against Madore was compelling. There was no issue of identity: Printup, the victim, identified Madore as his attacker. Printup testified that he had known Madore for twelve years and related that he "focused on [Madore's] face" during the attack. T.96, 99.

Joseph, who also had known Madore for a number of years, recognized Madore as he ran from the crime scene and testified that Madore was wearing a plaid flannel jacket and had a ponytail. When Madore was apprehended, he was wearing a plaid flannel jacket inside-out and had his hair in a ponytail. T.218, 248. After reviewing the record in its entirety, the Court is confident that the admission of Madore's un-*Mirandized* statement to the police had no effect on the jury's verdict and that Madore was not prejudiced by its admission.

**Claim IV. Harsh and excessive sentence**

 Turning to Madore's claim that his sentence was harsh and excessive, I note that a petitioner's assertion that a sentencing judge abused his discretion in sentencing is generally not a Federal claim subject to review by a habeas court. *See Fielding v. LeFevre*, 548 F.2d 1102, 1109 (2d Cir.1977) (petitioner raised no cognizable Federal claim by seeking to prove that State judge abused his sentencing discretion by disregarding psychiatric reports) (citing *Townsend v. Burke*, 334 U.S. 736, 741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948) ("The [petitioner's] sentence being within the limits set by the statute, its severity would not be grounds for relief here even on direct review of the conviction, much less on review of the state court's denial of habeas corpus.")). A challenge to the term of a sentence does not present a cognizable constitutional issue if the sentence falls within the statutory range. *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir.1992); *accord Ross v. Gavin*, 101 F.3d 687, 1996 WL 346669 (2d Cir.1996) (unpublished opinion).

Here, Madore was convicted of one count of first degree assault. Prior to sentencing, he was adjudged a second felony offender. Madore's determinate eight-year sentence was the minimum authorized under the circumstances. *See* N.Y. Penal Law § 70.06(1)(a), (2), (6)(a).

Therefore, this claim is not cognizable on habeas review.

## CONCLUSION

For the reasons stated above, Marc Madore's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because Madore has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**